REVISED OCTOBER 17, 2002

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————————————

No. 01-30036

———————————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

EDWIN EDWARDS; STEPHEN EDWARDS;
CECIL BROWN; ANDREW MARTIN; BOBBY JOHNSON,

Defendants-Appellants.

--------------------------------------------------------------
Appeals from the United States District Court
for the Middle District of Louisiana, Baton Rouge
--------------------------------------------------------------
August 23, 2002

Before HIGGINBOTHAM, WIENER and BENAVIDES, Circuit Judges.

Benavides, Circuit Judge:

After a long, complex trial, the former governor of Louisiana, his son, and several of his associates were convicted for their roles in various schemes to make money from Louisiana's riverboat gambling license process by exploiting the former governor's apparent ability to influence that process. The defendants appeal their convictions for, *inter alia*, extortion, mail and wire fraud, money laundering, making false statements, and RICO violations. Finding no reversible error, we affirm.

## I.

Edwin Edwards was a prominent figure in Louisiana politics for more than two decades. After serving in the Navy during World War II and later obtaining his law degree, he spent several years in private practice and local politics. He served as a member of the United States House of Representatives from 1965 until 1972, when he was elected to the first of two consecutive terms as Governor. In 1980, he left the governor's office and served briefly on the Louisiana Supreme Court. He then returned to private practice until 1984, when he was elected to a third term as Governor. After two federal corruption trials in 1985 and 1986, resulting in a hung jury and an acquittal, respectively, he lost his bid for re-election in 1987. In 1992, however, the voters sent him back to the Governor's office for an unprecedented fourth term. When that term ended in 1996, he once again returned to private practice. In private practice, he worked closely with his son, Stephen Edwards, who is also a lawyer.

Stephen and Edwin Edwards were convicted with several of the Governor's associates. Cecil Brown ("Brown"), an auctioneer and businessman, held the title of "Special Assistant to the Governor." Andrew Martin ("Martin") was a businessman who worked in the commercial fishing and marine towing industries, along with serving as a public official on state commissions. From 1992 to 1995, Martin held the title of Executive Assistant to the Governor. Bobby Johnson ("Johnson"), a self-made cement magnate, was a close friend of Edwin Edwards. In addition to these convicted defendants, two of Edwin Edwards' associates were acquitted: Gregory Tarver ("Tarver"), a Louisiana State Senator and Ecotry Fuller ("Fuller"), a former member of the Louisiana Gaming Control Board ("the Board").

Originally, these seven men were indicted en masse. The government alleged that each was

2

a member of a conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The indictment broke the conspiracy into five separate schemes. Pursuant to each scheme, the conspirators were alleged to have extorted money from various individuals who sought approval of riverboat casino projects. The conspirators promised to help these individuals obtain licenses in exchange for money and threatened to make obtaining the licenses impossible if they did not pay.[1] It was further alleged that the conspirators attempted to launder the money obtained through the schemes.

Brown was the major player in the LRGC/NORC Scheme. Brown, ostensibly representing Edwin Edwards (who was acquitted of all acts relating to this scheme), defrauded and extorted the Louisiana Riverboat Gaming Corporation ("LRGC") and the New Orleans Riverboat Corporation ("NORC") (controlled by the same principals) by promising each a riverboat license if they paid exorbitant consulting fees despite the fact that he knew that LRGC and NORC would not receive licenses. Brown spoke with LRGC/NORC principals between the Fall of 1991 and the Summer of 1993, when the key licensing vote occurred. During that period, Brown was paid approximately $350,000.

Brown and Johnson carried out the Jazz Scheme. Claiming to represent Edwin Edwards, they extorted Jazz Enterprises, Inc. ("Jazz"), one of three applicants for two available Baton Rouge

---

[1] In 1992 the Louisiana Riverboat Gaming Commission was created to evaluate applicants for fifteen riverboat gaming licenses available in Louisiana. The Commission was made up of seven panel members, each of whom was appointed by Edwin Edwards. By 1993, it had awarded all fifteen certificates of preliminary approval. The Commission did not have authority to issue the licenses, as it only determined whether the applicant was acceptable. Nevertheless, fourteen of the fifteen applicants awarded preliminary approval were granted licenses by the Louisiana State Police, Riverboat Gaming Division. In 1996, the Commission was replaced by the Louisiana Gaming Control Board, made up of six members appointed by Governor Mike Foster. The Board awarded the final certificate of preliminary approval. The appellants' extortion demands were based on their actual or apparent ability to manipulate the votes of these two entities.

3

riverboat licenses. Brown and Johnson spoke with the Jazz principals between February 1994 and August 1994. Jazz did not agree to the extortion demand, but it received a license anyway in July 1994. Edwin Edwards was ultimately acquitted on all counts relating to this scheme.

Stephen Edwards, his friend Richard Shetler ("Shetler") and Edwin Edwards were the major players in the Players Scheme. Stephen Edwards, representing his father, extorted Players Casino ("Players"), demanding that it retain him as a lawyer and hire his merchandising firm and Shetler as consultants to obtain a license and receive other benefits. Stephen Edwards spoke with Players between May 1993 and approximately February 1995. During this time, Players paid Shetler and Stephen Edwards more than a million dollars.

The primary participants in the Treasure Chest Scheme included Martin, Edwin Edwards, and Stephen Edwards. Martin, representing the Governor, extorted Robert Guidry ("Guidry"), who was a principal of the Treasure Chest Casino. Martin was in contact with Guidry between April 1994 and April 1997. Over these years, Guidry paid Stephen Edwards, Edwin Edwards, and Martin more than a million dollars.

The 15th Riverboat License Scheme, so named because it was the final license to be awarded by the Board, was a father-son operation. Stephen Edwards and Edwin Edwards extorted Eddie DeBartolo, Jr. ("DeBartolo") and his business partner, Ed Muransky. DeBartolo, the then-owner of the San Francisco 49ers professional football team, was seeking a riverboat license pursuant to a joint venture between his company, DeBartolo Entertainment Corporation, and Hollywood Casino. Edwin Edwards and Stephen Edwards were in contact with DeBartolo between September 1996 and April 1997. DeBartolo made a one-time $400,000 payment to Edwin Edwards and Stephen Edwards in March 1997.

On August 4, 1999, a grand jury returned a 34-count superseding indictment, charging appellants Edwin Edwards, Stephen Edwards, Martin, Johnson and Brown with a violation of RICO [18 U.S.C. § 1961 et seq.], conspiracy to violate RICO [18 U.S.C. § 1962(d)], mail and wire fraud [18 U.S.C. § 1341 et seq.], extortion [18 U.S.C. § 1951], money laundering [18 U.S.C § 1956], interstate travel and communication in aid of racketeering [18 U.S.C. § 1952] and false statements [18 U.S.C. § 1001].

The case was tried to a jury, and the appellants were convicted as follows: Edwin Edwards [Counts 1-2 (RICO), 12-15 (Players extortion), 17-19 (Treasure Chest extortion), 20-22 (15th Riverboat License fraud), 25-27 (15th Riverboat License fraud), 31 (15th Riverboat License extortion) and 34 (money laundering)]; Stephen Edwards [1-2, 12-15, 16 (Interstate Travel in Aid of Racketeering) 17-19, 20-22, 25-27, 31 and 34]; Martin [1-2, 17-19 and 34] Brown [1-2 and 3-4 (Jazz extortion)]; and Johnson [3-4, 5 (Interstate Communication in Aid of Racketeering), 6 (fraud), and 7-11 (false statements)]. Subsequent to the verdict, the Supreme Court decided *Cleveland v. United States*, 531 U.S. 12 (2000), holding that mail and wire fraud convictions cannot be based on the theory that the government was defrauded of its intangible right to issue licenses (hereinafter, "license as property theory"). In light of *Cleveland*, the district court granted new trials as follows: Edwin Edwards [Counts 20-22 and 25-27]; Stephen Edwards [20-22 and 25-27]; and Johnson [6].

In the process of trying this case, the district court made a number of rulings that are now challenged. Specifically, the appellants contend that: (1) the district court erred by empaneling an anonymous jury; (2) the district court erred when it admitted evidence obtained via unauthorized wiretaps; (3) the district court erred when it admitted hearsay evidence pursuant to Fed. R. Evid. 801(d)(2)(E); (4) the district court erred when it ordered Johnson tried in absentia; (5) the district

court erred when it dismissed Juror #68 during deliberations; (6) the evidence at trial was insufficient to support all Brown and Johnson's convictions as well as Stephen Edwards's extortion conviction relating to the 15th Riverboat License Scheme; (7) the spillover effect from the counts based on the *Cleveland*-repudiated "license as property" theory requires reversal of appellants' convictions on some or all of the other counts; (8) Stephen Edwards' sentence should be vacated because the calculation of the extortion payments was overstated; and (9) Johnson's sentence should be vacated because the calculation of the extortion payments was overstated and because the evidence did not support an adjustment for obstruction of justice; (10) the restitution award against Martin should be set aside because it was not supported by the jury verdict; and (11) various aspects of their trial violated their due process rights. We address each contention in turn.

## II.

Aware of the intense media, political, and emotional atmosphere surrounding this case, the district court withheld certain identifying information about potential jury members. This omitted information included their names and places of employment. Regarding the potential jurors' residential information, the district court released their zip codes and parishes, but withheld the exact addresses. Despite the lack of access to this information, the parties were able to view a large amount of other information about the venirepersons, including a twenty-eight page questionnaire consisting of 116 questions, some with subparts. Moreover, they were allowed to propose questions for potential jury members and ask follow-up questions. The defendants contend that by withholding some juror information, the district court violated their right to a fair trial before an impartial jury. Additionally, they argue that this injury was exacerbated by the district court's decision to close the proceedings it held to determine whether to withhold juror information. The closure of these

6

proceedings, the defendants contend, violated their Sixth Amendment right to a public trial.

## A.

We have previously recognized the seriousness of the decision to withhold juror information, holding that it should be a last resort in a court's efforts to protect the jurors from intimidating or prejudicial influences. *See United States v. Krout*, 66 F.3d 1420, 1427 (5th Cir. 1995). This interest in juror protection must be balanced against the defendant's interest in effective voir dire and the presumption of innocence. *See id.* The decision to empanel an anonymous jury is within the discretion of the district court. *United States v. Sanchez*, 74 F.3d 562, 564 (5th Cir. 1996). Factors that may support a district court's decision include:

(1)  the defendants' involvement in organized crime;
(2)  the defendants' participation in a group with the capacity to harm jurors;
(3)  the defendants' past attempts to interfere with the judicial process or witnesses;
(4)  the potential that, if convicted, the defendants will suffer a lengthy incarceration and substantial monetary penalties; and
(5)  extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment.

*Krout*, 66 F.3d at 1427. Although the district court must base its decision on "more than mere allegations or inferences of potential risk[,]" *id.*, it may consider the indictment and affidavits submitted by the parties. *See United States v. Wilson*, 160 F.3d 732, 747 (D.C. Cir. 1998) (relying on indictment and prosecutor's affidavit); *Krout*, 66 F.3d at 1427 (relying on unsworn affidavit). In view of the totality of the circumstances, the district court must "make a sensitive appraisal of the climate surrounding a trial and a prediction as to the potential security or publicity problems that may arise during the proceeding." *United States v. Branch*, 91 F.3d 699, 723-24 (5th Cir. 1996) (quoting *United States v. Childress*, 58 F.3d 593, 702 (D.C. Cir. 1995)). We will not find an abuse of

7

discretion if the "evidence at trial supports the conclusion that anonymity was warranted." *Krout*, 66 F.3d at 1427.

As the *Krout* factors suggest, the paradigmatic situation justifying an anonymous jury is an organized crime trial, where the safety of the jurors becomes an overriding concern. *See, e.g.,United States v. Salvatore*, 110 F.3d 1131, 1143-44 (5th Cir. 1997) (upholding anonymous jury in case involving organized crime defendants)*, overruled on other grounds by Cleveland*, 531 U.S. 12 (2000); *Krout*, 66 F.3d at 1427 (upholding anonymous jury in prosecution of member of Texas "Mexican Mafia"). This is not to say, however, that the withholding of juror information is appropriate only in organized crime cases. We have previously approved of an anonymous jury when the case attracts unusually large media attention and arouses deep passions in the community. In the *Branch* case, we affirmed the district court's decision to withhold certain identifying juror information in the trial of former members of the Branch Davidian sect. Cautioning that "[n]ot all celebrated trials merit an anonymous jury," we nevertheless relied on the intense press coverage and the passions that the trial incited, even though there was no indication that any of the defendants would interfere with the jurors. *Branch*, 91 F.3d at 723-24. In this respect, the present case closely resembles *Branch*. The overriding concern, and the most important factor in the district court's analysis, was the intense media interest and highly charged emotional and political fervor that surrounded the trial. Edwin Edwards was a four-term governor who, partly because of his previous legal entanglements, was a polarizing figure in Louisiana politics. His son, Stephen Edwards, had attracted intense media coverage. Tarver was a Louisiana state senator. In addition to these high profile defendants, several well known witnesses would testify at trial, including DeBartolo, the owner of the Super Bowl Champion San Francisco 49ers, and Cleo Fields, a state senator and former United States

Congressman.

Moreover, the district court did not base its decision on publicity alone. There were several allegations and examples of attempts to interfere with the judicial process and witnesses. The indictment charged Edwin Edwards and Stephen Edwards with the illegal wiretapping and countersurveillance of an FBI agent.[2]   In a related trial, Edwin Edwards was accused of witness tampering,[3] and the government filed an affidavit accusing Edwin Edwards of using a state trooper to run records searches on certain persons during his previous criminal trials. Furthermore, the present case involved his efforts to corrupt the state's process for licensing riverboat gambling.

In addition to these indications of the defendants' disregard for proper administrative and judicial processes, the remaining *Krout* factors also support the district court's decision to withhold juror information. The defendants all faced long periods of incarceration and significant prison sentences if convicted on all charges. Edwin Edwards alone faced a maximum of 375 years in prison and a fine of over $7,500,000. Furthermore, the district court was concerned with the possibility that persons not directly involved with the case would engage in juror intimidation or harassment. Intrepid members of the media, for example, published the identity of a juror when it was discovered. They also attempted to identify jurors by determining where they were parked and obtaining their license plate information. Moreover, Edwin Edwards had numerous close political operatives and allies who also might have attempted to influence the jurors. The prospect of such interference from the media and politically interested third parties militates in favor of withholding juror information.

In assessing the reasonableness of the balance that the district court struck between the

---

[2]A co-defendant, Dempsey White, pled guilty to a related charge, but the wiretap charge against Edwin Edwards and Stephen Edwards was later severed from the rest of the case.

[3]Edwin Edwards was ultimately acquitted of this charge on October 11, 2000.

9

defendants' rights and the protection of the jurors, we also note that the information withheld from the parties was limited. In referring to such juries as "anonymous," we have previously cautioned against "painting with too broad a brush." *Branch*, 91 F.3d at 723. As in *Branch*, the jury here was "anonymous" only "in the most literal sense." *Id.* The parties had access to the jurors' zip codes, parishes, and the extensive information contained in the long questionnaire. With this information, the defendants are hard-pressed in demonstrating that they were prejudiced in any way during voir dire. They point to Juror 370, who had indicated on a questionnaire that she knew Stephen Edwards' wife's mother and grandmother "all her life." A post-trial investigation allegedly revealed that she had made negative statements about Edwin Edwards in the past. While recognizing that the withholding of juror information naturally invites this type of problem, we cannot find any real prejudice related to the empaneling of Juror 370. Her connection to Stephen Edwards was tenuous, and there is no indication that this connection biased her against the defendants.

Finally, we do not overlook the fact that the district court minimized the possibility of any prejudice to the defendants by giving an explanatory jury instruction, which was similar to the instruction upheld in *Branch*. *See id.* at 724 (noting that the trial judge in that case had explained the anonymity procedures as a respo nse to intense trial publicity, polled the jury for any bias, and reaffirmed that the defendants were entitled to a presumption of innocence). This instruction referred to the intense media publicity as the reaso n for anonymity and gave no indication that the jurors should fear for their safety from the defendants. It reiterated that the defendants were presumed innocent until proven guilty and that the district court was using these procedures to protect juror privacy and ensure a fair trial for both sides. The district court then questioned the jurors to determine whether they had any bias toward either party as a result of the decision to withhold their

10

names. All jurors assured the district court that they did not harbor any such bias. Accordingly, in light of the weighty reasons for concealing juror information, the limited scope of the concealment, and the district court's careful efforts to avoid prejudicing the defendants, we find no abuse of discretion.[4]

**B.**

The defendants also contend that the district court's decision to close the hearing on whether to empanel an anonymous jury violated their Sixth Amendment right to a public trial. Their opposition to the closure represented a reversal of strategy. Initially, they had argued that the proceedings should not be public. Once damaging information appeared in the media, however, they began to worry about public speculation that Edwin Edwards had ties to organized crime. As a result of this concern, they changed their minds and unsuccessfully attempted to open the proceedings.

At the outset, we note that we have already approved the closure of voir dire proceedings in a related case, in which Edwin Edwards was also a defendant. *See United States v. Brown*, 250 F.3d 907, 922 (5th Cir. 2001). Although *Brown* involved a First Amendment challenge to the closure of the voir dire proceedings, this distinction does not change our analysis. The caselaw applying the Sixth Amendment guarantee of a public trial was originally developed in cases involving the right of

---

[4]Martin argues that even if the district court was justified in withholding information from some defendants, those justifications do not apply to him. This argument suffers from several flaws. First, the district court explicitly stated that there was direct evidence to justify an anonymous jury in the cases of Edwin Edwards, Stephen Edwards, and Martin. *See United States v. Edwards*, 119 F.Supp.2d 589, 603 n.76 (M.D. La. 2000). Regarding Martin, the district court pointed to a phone conversation in which Martin claimed that he had a transcript of a wiretap and that he had received it from a "friend of a friend of a friend," chuckling afterward. Although Martin claims that this transcript was publicly available, his comments during the conversation suggest something short of reverence for the judicial process. Second, even if there were no evidence of jury tampering or disregard for the judicial process, *Branch* clearly stands for the proposition that if other factors such as media interest are strong enough, an anonymous jury can be appropriate. *See Branch*, 91 F.3d at 724. We therefore conclude that the district court did not abuse its discretion by withholding juror information from Martin.

11

the public and press to attend trials, which is implicit in the First Amendment. *See Ayala v. Speckard*, 131 F.3d 62, 68-69 (2d Cir. 1997) (en banc); *see also Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984) (discussing press access to voir dire); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982) (discussing press access to trial and preliminary hearing); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) (discussing press access to trial). In *Waller v. Georgia*, 467 U.S. 39 (1984), the Supreme Court applied these standards in the Sixth Amendment context, holding that the closure of a suppression hearing may violate the defendant's right to a public trial. *Id.* at 47 ("In sum, we hold that under the Sixth Amendment, any closure of a suppression hearing over the objections of the accused must meet the tests set out in *Press-Enterprise* and its predecessors."). In doing so, the Court articulated the following test for determining whether the closure of a proceeding violates the Sixth Amendment:

(1)   the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced;
(2)   the closure must be no broader than necessary to protect that interest;
(3)   the trial court must consider reasonable alternatives to closing the proceeding; and
(4)   it must make findings adequate to support the closure.

*Id.* at 48. Subsequent to *Waller*, the Court refined the first factor of this test, requiring a "substantial interest." *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 14 (1986).

We must first determine whether *Waller* applies to the proceedings at issue in this case. In *United States v. Norris*, 780 F.2d 1207, 1210-11 (5th Cir. 1986), we refused to extend that test to a bench conference about the admissibility of a particular piece of evidence. We distinguished full suppression hearings, like the one considered in *Waller*, on the grounds that they often resemble a mini-trial and commonly determine the outcome of the prosecution. *Id.* at 1210. Because suppression hearings feature witnesses and involve an attack on the police and prosecutors, there is

12

a vital public role in discouraging perjury and assuring that the government comports itself responsibly. *Id.* By contrast, legal arguments over relatively routine administrative matters do not implicate such concerns. *Id.* Although it is impossible to characterize the proceedings regarding the district court's decision on whether to withhold juror information as outcome determinative, we do see an important public role that counsels in favor of applying the *Waller* test. Like the suppression hearing, such proceedings involve an attack on the prosecution, specifically its accusations that the defendants constitute a threat to the integrity of the jury. Therefore, the argument that the presence of the public discourages perjury and encourages prosecutorial responsibility applies with some force to the anonymous jury proceedings. Accordingly, we decline to hold that the closure of such proceedings can *never* violate the Sixth Amendment.

This is not to say, however, that the proceedings always must be conducted in public. Rather, the *Waller* test recognizes that a limited closure of proceedings can serve a substantial institutional interest without violating the Sixth Amendment. Indeed, the interest in avoiding prejudice in the jury pool may be particularly compelling in situations like these. Because these proceedings are not full trials, there is often a limited chance for the defendant to properly contextualize or fully attack what are often mere allegations. As in the present case, the district court often will be relying in part on affidavit, accusation, and suggestion. In the absence of a full, critical evaluation and cross-examination, such raw allegations could make their way into the public discourse, thereby proving highly prejudicial to the defendant.

The defendants argue that the district court was not motivated by this interest in a fair trial for them, but rather closed the proceedings to protect the government. The record does not support this contention. The district court did worry about the association of "inaccurate motives with the

13

government's motion," but its concern was clearly with the fairness of the impending trial and, in particular, the prejudicial effect of such public speculation on the defendants. Moreover, in case any doubt surrounded the district court's motives, it summed up its core concern: "The overall effect of conducting a public hearing on the motion would be just the harm the Fifth Circuit warns against: an unfair trial for the defendants." We therefore conclude that a substantial interest supported the district court's decision to hold nonpublic proceedings on the motion for an anonymous jury.

We also conclude that the district court's action was no broader than necessary, as the defendants have proposed no viable alternatives to closure. They propose that the district court should not have worried about the possible taint of the jury pool because any tainted potential jurors could have be removed during voir dire. Acknowledging the potential prejudicial effect of accusations about the defendants' alleged threat to juror integrity, however, we decline to require district courts to wait until voir dire to remedy any taint. Rather, we preserve the district court's ability, when necessary, to act prophylactically to avoid the problem. Accordingly, we hold that the closure of the proceedings surrounding the anonymous jury did not violate the Sixth Amendment guarantee of a public trial.

**III.**

At trial, the government relied in part on evidence obtained from the electronic surveillance of Cecil Brown's phones and Stephen Edwards' office. This surveillance began after the government was approached by an informant, Pat Graham ("Graham"). Based on information provided by Graham, the government filed an application to wiretap Brown's home and office phones. The information it learned from this surveillance led to the wiretap of Edwin Edwards' home. Eventually, the government also placed bugs, video cameras, and wiretaps in the offices of Edwin Edwards and

14

Stephen Edwards. The defendants now challenge this surveillance. Their primary argument is that the original authorization for the Brown wiretap was improper because the FBI affidavit in support of the application was based on misleading information. This argument has already been considered and rejected by another panel of this Court in *United States v. Cecil Brown*, 2002 WL 1495898 (5th Cir. July 15, 2002). Upon our own review, we also find no merit in the defendants' arguments on this issue. In addition, Brown contends that the district court erroneously admitted intercepted communications between him and his civil attorneys in violation of the attorney-client privilege. Finally, Stephen Edwards argues that the government was not authorized to monitor his conversations with listening devices placed in his office.

**A.**

Brown contends that the district court erred in admitting wiretap intercepted conversations in violation of the attorney-client privilege. The conversations in question included several discussions, which at times involved Brown, his attorneys, Kenneth Pitre ("Pitre") and Robert J. Lenze ("Lenze"), and Edwin Edwards. They relate to lawsuits brought by principals of LRGC/NORC for the return of money extorted by Brown. In an October 21, 1996 conversation, Brown, Edwin Edwards, and Pitre discussed the possible characterization of the extortion money paid to Brown as a loan rather than income because "we are not ever going to admit that this is a payment to him because then we'd owe income taxes on it." They then discussed the failure of LRGC/NORC to obtain a license, with Edwin Edwards stating that "Cecil can take the position that he did what was asked," and Brown responding "I carried the water to the right places."[5] Edwin Edwards then opined

---

[5]Brown also argues that the district court abused its discretion when it allowed a career FBI agent to testify that, in light of his experience, he believed that "carry the water" referred to the paying off of public officials. He contends that this was an expert opinion, but was never noticed or qualified for such purposes. This argument is without merit. We have previously found it acceptable for a lay witness to

that they needed someone to testify that LRGC/NORC was not awarded a license because "they were not strong enough financially." This explanation covered up the true reason for LRGC/NORC's lack of success, as articulated by Brown: "the Governor has too many friends." In a separate conversation, Brown told his attorney that the handling of the LRGC/NORC payments could not be exposed "openly in court" because with that money he had to "take care" of a "guy on the [Gaming] Board; and because we were throwing money around like crazy."

The attorney-client privilege, the oldest and most venerated of the common law privileges of confidential communications, serves important interests in our judicial system. *See Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Nevertheless, despite its venerated position, the privilege is not absolute and is subject to several exceptions. Under the crime-fraud exception to the attorney-client privilege, the privilege can be overcome "where communication or work product is intended 'to further continuing or future criminal or fraudulent activity.'" *In re Grand Jury Subpoena*, 220 F.3d 406, 410 (5th Cir. 2000) (quoting *United States v. Dyer*, 722 F.2d 174, 177 (5th Cir. 1983)). The government, as the proponent of the otherwise privileged evidence, "has the burden of establishing a prima facie case that the attorney-client relationship was intended to further criminal or fraudulent activity." *Id.* at 410. The district court agreed that the crime-fraud exception applied to these attorney-client communications, as Brown was using his lawyer's services to cover up crimes related to his extortion of LRGC/NORC. Because the application of the attorney-client privilege is a fact question to be determined in light of the purpose of the privilege and guided by judicial precedents, we review the district court's finding for clear error only. *United States v. Aucoin*, 964

---

"draw straightforward conclusions from observations informed by his own experience." *United States v. Riddle*, 103 F.3d 423, 429 (5th Cir. 1997). As the FBI agent's testimony merely represented his own informed opinion, the district court did not abuse its discretion in allowing it.

F.2d 1492, 1498 (5th Cir. 1992).

In determining whether the crime-fraud exception applies, we focus on the client's purpose in seeking legal advice. *In re Grand Jury Proceedings*, 43 F.3d 966, 972 (5th Cir. 1994) (per curiam). Brown relies heavily on the fact that the lawsuits that he hired Pitre and Lenze to defend did not allege any fraud or other crimes. He further contends that the communications are privileged because they relate only to a defense against allegations of past wrongs, not continuing or future crimes. The district court agreed with the findings of Judge John V. Parker of the Middle District of Louisiana, who determined that (1) the payments at issue in the lawsuits were made to Brown in exchange for his guarantee of obtaining riverboat licenses for LRGC/NORC through means of bribery and fraud and (2) Brown subsequently sought legal services to conceal and cover up the crimes committed with respect to the payments. We cannot conclude that these findings were clearly erroneous. Rather than merely defending himself against civil actions alleging past wrongdoing, Brown was actively continuing the cover-up of his extortion and perpetuating his tax fraud. *Cf. Dyer*, 722 F.2d at 177-78 (holding that a defendant's use of a civil attorney to obtain a false exculpatory letter was not privileged under the crime-fraud exception). Accordingly, we find no abuse of discretion in the admission of the communications between Brown and his attorney.

**B.**

The information it learned from consensual recordings and covert surveillance of Brown and others led the government to seek permission to increase its monitoring of Edwin Edwards and his associates. On December 6, 1996, the government obtained an authorization order to intercept oral communications "at the premises known as the law office of Edward [sic] W. Edwards located at 4621 Jamestown Avenue." The named interceptees included Edwin Edwards, Brown, Richard L.

17

Stalder, Pitre, Marion D. Edwards, and Wanda Edwards. Pursuant to this authorization order, the government placed listening devices in the personal office of Stephen Edwards and intercepted at least two of his conversations. The defendants contend that these actions exceeded the scope of the December 6 order in two ways. First, the government was not allowed to place monitoring devices in the office of Stephen Edwards. Second, even assuming *arguendo* that the order permitted the placement of devices in Stephen Edwards' office, it did not provide for the interception of his conversations because he was not a named interceptee. The district court rejected these arguments. We review its interpretation of the December 6 order de novo. *See United States v. Smith*, 273 F.3d 629, 632 (5th Cir. 2001) (legal conclusions on motion to suppress reviewed de novo); *United States v. Reyna*, 218 F.3d 1108, 1110 (9th Cir. 2000) (wiretap suppression reviewed de novo).

Certainly, the defendants are correct in noting that the December 6 order does not explicitly refer to Stephen Edwards' personal office. This omission, however, does not end the inquiry, as we must still determine whether the placement of devices in Stephen Edwards' office was justified under the order's reference to "the premises known as the law office" of Edwin Edwards. Central to the resolution of this issue is the definition of "the premises known as the law office," specifically, whether it referred to the entire group of legal offices at 4621 Jamestown Avenue or merely to Edwin Edwards' personal office within the suite. Because it is not clear from the face of the order how expansive that term was intended to be, it is helpful to consult the affidavit and application upon which the order was based.[6] A reading of the detailed, sixty-seven page affidavit submitted by FBI

---

[6]The defendants object to our consideration of the affidavit, noting that the affidavit was not physically connected to the order or even referenced in it. *See United States v. Dahlman*, 13 F.3d 1391, 1395 (10th Cir. 1993) (refusing to expand scope of warrant based on affidavit where the affidavit was not physically attached to the warrant or referenced in it). There is a difference, however, in resorting to the affidavit to resolve an ambiguity and relying on it to expand an otherwise clear term in the order. Because our inquiry is limited to the former, we reject the defendants' argument that the affidavit is irrelevant.

Special Agent Geoffrey C. Santini supports an expansive interpretation of "the premises known as the law office." The affidavit states, in part:

> On December 3, 1996, a separate cooperating witness (CW-3) advised that if an individual entered the front door of the law office and turned right at the reception desk, the first office on the right as one proceeded down the hall is the personal office of Stephen R. Edwards. The next office on the right down the hall is the personal office of Edwin W. Edwards. (Affiant asserts that Edwin W. Edwards' office is located in the front corner of the law office). CW-3 advised that Edwin W. Edwards currently conducts business in his personal office and on occasion in the office of Stephen R. Edwards.

As this passage suggests, there is a difference in usage between the terms "law office" and "personal office." This distinction is further supported by an attachment to the affidavit, which diagrams the layout of the entire office. The attachment indicates that although Edwin Edwards and Stephen Edwards had separate personal offices, the entire group of offices comprised a single, cohesive office area. There was a common reception desk, library, conference room, clerical/secretary area, and coffee area. Finally, the affidavit stated that, according to a cooperating witness, Edwin Edwards "would in effect use the entire office for meetings and on many occasions the CW would meet and observe [Edwin] Edwards in Stephen R. Edwards [sic] office." Our review of the affidavit, therefore, clarifies that the December 6 order's reference to the law office of Edwin Edwards includes the entire group of legal offices at 4621 Jamestown Avenue, not merely the personal office of Edwin Edwards.[7]

---

[7]In interpreting the terms of the December 6 order, we ultimately place little weight on the government's decision on April 16, 1997 to include a specific reference to the "law office" of Stephen Edwards in its application for an extension and modification of the authorization order. The defendants argue that the explicit reference to Stephen Edwards' law office in the April 1997 application is a tacit admission that the government did not previously have the authority to monitor his office. We think the reliance on the April 1997 application is misplaced. The issue in determining the proper scope of the December 6 order's reference to the law office of Edwin Edwards is what the issuing court intended by the use of the term "law office." As such, we consulted the December 6 affidavit on which it relied. By contrast, the government's intent in changing the language of its April 1997 application is, at best, of marginal relevance to our analysis of the court's use of the term "the premises known as the law office" in the December 6 order.

19

Accordingly, we agree with the district court that the order permitted the government to place listening devices in the personal office of Stephen Edwards.

The defendants further contend that even if the listening devices were properly placed in Stephen Edwards' office, the government was not permitted to listen to his conversations because he was not a named interceptee. In particular, two conversations are at issue. The first conversation, which took place on December 19, 1996, involved Edwin Edwards and Stephen Edwards discussing how to write checks so that they could disguise the criminal proceeds. The next day, the government intercepted a second conversation featuring Stephen Edwards talking with Wanda Edwards, Marion Edwards, and Cecil Brown, all three of whom were named interceptees. Again, it is beyond dispute that Stephen Edwards is not among the named interceptees in the December 6 order, and that he was not added to that list until January 15, 1997, when the first thirty-day extension was granted. The order, however, does not limit its scope to named interceptees only. Instead, it provides that interception may take place only when

> one of the named interceptees are [sic] within the target premises and are engaged in conversation or activity with any named or known coconspirator or any other individual that was caused to go to the target premises by a named interceptee or named or known coconspirator as related to the criminal offenses as set forth in paragraph A.

The government contends, and the district court agreed, that the interception of Stephen Edwards' conversations was appropriate because he was a coconspirator, as evidenced by the December 19 and 20 conversations. It further relied on the fact that the government kept the issuing court fully abreast of the monitoring through a December 27, 1996 status report. Therefore, it argues, the interception of these conversations was fully authorized.

We do not reach the same conclusion. As the government concedes, because Stephen

20

Edwards was not a named interceptee, the interception could be legal only if he was a "named or known coconspirator." Contrary to the government's suggestion, however, our focus in determining whether Stephen Edwards was a coconspirator must be on December 6, not on the dates of the intercepted conversations. Relying on the content of the actual conversations to justify post hoc otherwise illegal interception would constitute impermissible bootstrapping. If the interception was not legal when the conversation began, it does not become legal simply because of what the participants discussed. We must therefore look instead for evidence that the government knew that Stephen Edwards was a coconspirator on December 6. Not only does the government fail to identify any such evidence, the clear terms of its December 6 application and affidavit suggest that none exists. As of December 6, the government was aware that Stephen Edwards maintained an office at the target premises and that Edwin Edwards often used that office to conduct business. Nevertheless, there is no indication in the affidavit that the government thought that Stephen Edwards was involved in the alleged extortion schemes. By contrast, other members of the Edwards family who had offices at the target premises, such as Wanda Edwards and Marion Edwards, were suspected of illegalities and therefore were listed as named interceptees. In other words, our reading of the December 6 order, application, and affidavit leads us to the conclusion that Stephen Edwards was not listed as a named interceptee precisely because the government did not think he was a coconspirator. Accordingly, because we conclude that Stephen Edwards was not a "named or known coconspirator" under the terms of the December 6 order, we hold that the December 19 and 20 conversations were illegally recorded and should have been suppressed. *See* 18 U.S.C. § 2518(10)(a) (providing for suppression remedy).

Having determined that the district court's admission of the December 19 and 20

conversations involving Stephen Edwards was erroneous, we now must decide whether that error was harmless. To the extent that the error implicates Stephen Edwards' Fourth Amendment rights, we ask whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999) (quoting *Chapman v. Cal.*, 386 U.S. 18, 24 (1967)). There is no dispute that the suppression of the December 19 and 20 conversations alone would not have made a difference in the verdict, as the evidence of the defendants' guilt was overwhelming. Rather, the defendants suggest that the evidence obtained from the December 19 and 20 conversations provided the basis for the inclusion of Stephen Edwards as one of the named interceptees on the January 15, 1997 wiretap application. Moreover, they contend that the conversations also led to the April 1997 search of Stephen Edwards' home. These arguments overstate the importance of the illegal interception. In its affidavit in support of its application for the January 15, 1997 wiretap authorization, the government detailed a January 9, 1997 conversation between Edwin Edwards and Martin. The two men discussed Stephen Edwards' role in the Treasure Chest Scheme, including a payment from Guidry to Stephen Edwards. Based on this evidence of Stephen Edwards' involvement in the extortion scheme, there was a solid basis for adding Stephen Edwards as a named interceptee on January 15, even without the December 19 and 20 conversations. After receiving the January 15 wiretap authorization, the government amassed extensive evidence of Stephen Edwards' criminal activities to support its subsequent April 1997 application for a search warrant. In light of this evidence, which was wholly independent of the December 19 and 20 conversations, we hold that the admission of the illegal interceptions was harmless beyond a reasonable doubt.[8]

---

[8]The defendants also argue that they were entitled to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). They do not, however, explain why such a hearing was necessary, except to assert in

## IV.

At trial the district court admitted, over hearsay objection, testimony from Bernie Klein ("Klein"), describing statements made to him by Sam Gilliam ("Gilliam"). It concluded that the statements were non-hearsay because they were statements by a co-conspirator in furtherance of a conspiracy. *See* Fed. R. Evid. 801(d)(2)(E). Klein backed the Gretna Belle riverboat casino project. At the time, Gilliam was a co-chairman of the Louisiana Riverboat Gaming Commission. Klein testified that he approached Gilliam after Gilliam voted against the Gretna Belle. Klein was surprised because he believed that Gilliam supported the Gretna Belle. Klein further testified that when he confronted Gilliam about the vote, Gilliam admitted that he had been instructed to change his vote or lose his livelihood.

The district court also admitted, over hearsay objection, testimony from Judge Hillary Crain ("Crain"), describing statements made by Ralph Perlman ("Perlman"), again concluding that the statements were non-hearsay because they were statements by a co-conspirator in furtherance of a conspiracy. *See* Fed. R. Evid. 801(d)(2)(E). At the time, Crain was the chairman of the Gaming Control Board and Perlman was a Board member. Crain was responsible for ensuring compliance with the Board's rules, specifically its no-contact policy, whereby Board members agreed not to meet

---

passing that there was no probable cause to support the placement of listening devices in the office of Stephen Edwards. This argument has no merit. The government had ample evidence from its cooperating witnesses that Edwin Edwards was using the entire law office, including Stephen Edwards' personal office, to carry out illegal activities. Moreover, because we do not interpret the December 6 order to authorize the interception of Stephen Edwards' conversations, we need not determine whether there would have been probable cause to do so. Therefore, we conclude that there was no deficit of probable cause in support of the December 6 order. To the extent that the defendants argue that they were entitled to a *Franks* hearing on another issue, such as the probable cause supporting the search of Stephen Edwards' or Edwin Edwards' homes, that argument has been waived for lack of sufficient development in the brief. *See United States v. Posada-Rios*, 158 F.3d 832, 867 (5th Cir. 1998) (deeming issued waived as a result of inadequate briefing).

with anyone *ex parte* to discuss the licensing votes. Crain testified that Perlman said that he met

Edwin Edwards for lunch, at which Edwin Edwards expressed interest in the upcoming vote. Crain

also testified to a second, later statement by Perlman that he met with Edwin Edwards an additional

time. Perlman reported that at that meeting Edwin Edwards asked him for his vote and told him that

he already had the votes of the other Board members.

The defendants argue that the two aforementioned sets of statements were admitted in

violation of the Confrontation Clause because the government failed to offer evidence that Gilliam

or Perlman were conspirators or that their statements furthered the conspiracy. *See Bourjaily v.*

*United States*, 483 U.S. 171, 182-183 (1987) (explaining that because the co-conspirator statement

exception to the hearsay rule is "firmly rooted," proper admission of a co-conspirator statement does

not offend the Sixth Amendment).

Although it is not clear from the record that the appellants asserted the Confrontation Clause

as to all of these statements (as opposed to a hearsay objection), we need not address whether they

were admitted in violation because we conclude that their admission was harmless beyond a

reasonable doubt. *See Hafdahl v. Johnson*, 251 F.3d 528, 539-40 (5th Cir. 2001). To determine

whether the error was harmless, "we consider the importance of the witness' testimony in the

prosecution's case, whether the testimony was cumulative, the presence or absence of evidence

corroborating or contradicting the testimony of the witness on material points, the extent of

cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case."

*Id.* (citation omitted).

All that these two sets of statements tend to prove is that the conspirators were influencing,

or attempting to influence, the licensing votes.[9] There was a great deal of evidence of this fact in the record, including a number of Fed. R. Evid. 801(d)(2) admissions by the defendants. Furthermore, the defendants extensively cross-examined both witnesses: in each case the cross-examination took up much of an entire court day, Klein's cross-examination testimony taking up 140 pages of transcript and Crane's 167 pages. Finally and most importantly, having reviewed the record, we conclude that government presented a strong case of guilt, including the aforementioned admissions, each victim's testimony to the defendants' extortion efforts and overwhelming documentary and wiretap evidence.

## V.

Nearly three months into the trial, the district court was faced with a major disruption when one of the defendants, Bobby Johnson, underwent multiple bypass surgery. Although the March 2000 operation was considered urgent, Johnson's heart condition was not a recent development. The problem first surfaced in relation to the trial when one of Johnson's attorneys, Patrick Fanning ("Fanning"), sent the district court a letter informing it of Johnson's health problems. The September 10, 1999 letter explained that Johnson had learned the previous day that he had six blocked arteries, a condition that was not treatable by any method other than surgery. It further stated that during the next week, Johnson would be speaking to several surgeons to schedule the procedure as soon as possible. At a status conference on September 13-14, the district court expressed its concern about Johnson's health, and suggested that any surgery should be scheduled well in advance of the January 10, 2000 trial setting. It specifically admonished him not to wait until the last minute.

---

[9]The Gilliam statement goes a little farther, i.e., he indicates that someone threatened him. Though arguably prejudicial (much less so because the source of the threat was not identified), the threatening aspect of the persuasion is minimally harmful because it does not tend to prove any element of any charged offense. In fact, the defendants concede that "the evidence having to do with the corruption of the commission and the licensing process does not comprise one of the seven schemes that are the predicates for the substantive portions of RICO[.]"

Indeed, only one day after the hearing, Johnson's cardiovascular surgeon, Carlton H. Sheely, M.D. ("Dr. Sheely"), sent Johnson a letter confirming that bypass surgery had been scheduled for September 24. Just two days prior to surgery, however, Johnson cancelled it and decided instead to undergo chelation therapy, an alternative treatment. A major factor in this decision was Johnson's fear that he would not survive the operation. His father-in-law had died after bypass surgery, and Johnson was afraid that he would suffer the same fate. Beyond assuaging his fears, though, chelation therapy had little to recommend it. Even Johnson admits that the evidence in support of it was mixed at best, and one of his doctors criticized it as "quackery."

Despite the district court's expressed concern about his condition, its worry that his health might jeopardize the trial schedule, and its desire to be kept up-to-date regarding the situation, Johnson never informed it that surgery had been scheduled and canceled. Moreover, instead of the careful medical attention that his condition required, Johnson went from September 1999 until March 2000 without seeing a cardiologist. During this time, he was treated by Stephanie F. Cave, M.D. ("Dr. Cave"), his physician and family friend, and James P. Carter, M.D., Chairman of the Nutrition Department at the Tulane School of Public Health and Tropical Medicine and a proponent of chelation therapy. Over the course of his chelation treatment, Johnson did report feeling better. According to Dr. Sheely, however, this perceived improvement is consistent with the placebo effect. Therefore, by the start of trial on January 10, 2000, Johnson had cancelled the surgery that two separate cardiologists had recommended, had avoided his regular cardiologist, and had embarked on an unproven treatment regime. The only indication of this turn of events that he gave to the district court was a brief reference during a December 10, 1999 pretrial conference to the fact that he was currently undergoing chelation therapy.

Set against this course of conduct was Johnson's firm belief that it was in his best interest to go to trial with the rest of the defendants, particularly Edwin Edwards. Specifically, he was hoping that some of the former governor's reputed good will would rub off on him. Moreover, his attorney's strategy was, in part, to portray Johnson as a victim of the crossfire in a decades-long battle between Edwin Edwards and the federal government. Johnson worried that the surgery would jeopardize his ability to be tried with the entire group of defendants, and he was, in the words of his attorney, "hell-bent" on going to verdict with them.

As the trial progressed, Johnson initially reported no complaints about his health. On March 2, nearly two months into the trial, the government began presenting evidence related to the Jazz Scheme and Johnson's role in it. This evidence was particularly damaging to Johnson's defense. He was heard on tape threatening Jazz vice-president Mark Bradley ("Bradley"), who also took the stand against Johnson. Several newspaper articles noted the devastating effect of the tapes and Bradley's testimony, speculating that it was difficult to imagine how Johnson would be able to beat the charges. By March 13, the government had completed its presentation on the Jazz Scheme and moved on to the 15th Riverboat Scheme, a matter that did not relate to Johnson. The completion of the government's case against Johnson marked the beginning of his continued absence from the trial. On March 14, Johnson left the proceedings early. When he had to leave early again the next day, attorney Fanning informed the district court that his client was having recurring trouble with his health. As he had done for all his absences since September 1999, Johnson waived his right to be present. Fanning further indicated that he had no intention of requesting a continuance or severance, as Johnson still wanted to continue with the trial.

Despite the increasing likelihood that his health would be a major obstacle to his ability to

continue with the trial, thereby presenting serious trial management problems for the district court, Johnson refused to see a cardiologist. On March 16, Fanning asked for the district court's help in convincing his client to visit the cardiologist. The district court flirted with the possibility of forcing Johnson to undergo a medical evaluation as a condition of his bail, but ultimately decided against it. On March 17 and 21, Johnson yet again left the trial before the afternoon session, waiving his presence on both occasions. He never returned. At a March 21 conference, the first of several regarding Johnson's predicament, the district court learned that Johnson had not seen a cardiologist since September 1999. Nevertheless, Johnson insisted that he did not want a severance or mistrial because he still believed that it was in his best strategic interest to proceed with the trial.

The next day, the district court was informed that Johnson had finally visited a cardiologist, Joseph Deumite, M.D. ("Dr. Deumite"), who had recommended an urgent heart catheterization. The district court was also advised that, unlike every time in the past, Johnson was now refusing to waive his presence even though the government's case against him was finished. On March 23, the district court received a letter from Dr. Deumite stating that bypass surgery had been scheduled for March 28. After the operation was performed, the government moved for trial in absentia. Johnson, whose team was split on strategic issues, sought a continuance.

On April 3, the district court held a conference to consider whether, and to what extent, Johnson could return from surgery to take part in his trial. After hearing from Dr. Sheely and Dr. Deumite, it concluded that the best available alternative was to grant Johnson's pending motion for a continuance. Johnson could use this time to recuperate, possibly enough to participate in the trial with certain accommodations. These accommodations, which included audio, video, or computer communication, would allow Johnson to monitor the trial from the comfort of his home. The

28

government agreed to this plan, but the other defendants, worried about the delay and seeking a severance from Johnson, objected. At that point, Fanning withdrew the motion for continuance, moved for a mistrial, and rejected the district court's proposed accommodations as unacceptable. In essence, as the district court noted, Johnson's deliberately reckless course of conduct with regard to his health had created a major problem: the government was moving for trial in absentia, one defendant had withdrawn a motion for continuance and moved instead for mistrial, and the other defendants were seeking a severance. The district court's tentative solution was to allow testimony to continue on matters unrelated to Johnson, giving Johnson the right to recall any of the witnesses on cross examination.

The following day, the district court sua sponte reconsidered this ruling and postponed trial until April 10. Concerned that Johnson did not really support the motion that Fanning had filed, the district court ordered him to submit an affidavit confirming his consent to a mistrial. During chambers conferences on April 4 and 6, it was clear from the statements of Fanning, Fanning's co-counsel, Ernest Johnson, and Bobby Johnson's wife, Kim Johnson ("Mrs. Johnson"), that Johnson did not consent to a mistrial and instead wanted to go forward with the trial. Further complicating the situation, Fanning and Ernest Johnson suggested to the district court that Johnson might not be competent as a result of his medication and po st-operation depression. Competency aside, it was clear that the relationship and communication between Fanning and Johnson had badly deteriorated. Specifically, Johnson was angry at Fanning after reading press coverage of Fanning's reference to his client in open court as a "buffoon." Ultimately, the district court, without an affidavit from Johnson and unsure as to whether any such affidavit would be knowing and intelligent, denied the motion for mistrial and granted the government's motion for trial in absentia.

29

Before the trial resumed on the morning of April 10, Fanning filed another motion for mistrial, which was now accompanied by affidavit from Johnson. The district court denied this motion, but stressed that Johnson could still take advantage of the numerous accommodations it had previously offered him. These options included (1) providing Johnson with a more comfortable chair, (2) having a nurse present at all times to monitor Johnson's blood pressure and check on his overall health, (3) instituting longer and more frequent breaks in the trial, (4) allowing Johnson to participate through audio or video feeds, (5) providing Johnson and his counsel with real time transcription of trial proceedings, (6) permitting counsel to take as many recesses as necessary to confer with Johnson, (7) allowing communication equipment such as cell phones or beepers in the courtroom so that counsel could reach Johnson, (8) appointing an additional attorney to stay at home with Johnson to advise him from that location, (9) exercising discretion under Fed. R. Evid. 611 to allow Johnson to present his defense after the other defendants had completed their case, and (10) permitting Johnson to testify as the last witness in the trial. All of these options would be provided at the expense of the district court. Nevertheless, Johnson declined them.

Johnson did not return to court until after the jury delivered its verdict. Although offered a chance to testify in his defense, taking frequent or extended breaks as his health required, he claimed that he was physically unable to do so. In all, the defendants were able to put on their case in a mere four days, as Edwin Edwards was the sole defendant to testify. Johnson also failed to offer any evidence in his defense. On April 17, the government presented its rebuttal case, which took less than one day. Before the government was allowed to make its closing argument in the Jazz Scheme, the district court contacted Dr. Deumite to obtain a progress report on Johnson's recovery. Even though Dr. Deumite had not seen Johnson in ten days, he told the district court that he expected him to have

30

improved substantially. He also noted that most patients would feel ready to return to at least limited activity about three weeks after the operation, and that Johnson's recovery period was reaching that point. The government was then allowed to finish its closing arguments. The defendants, including Johnson, also made their closing arguments before the case was submitted to the jury. Following the jury's verdict finding him guilty on several counts, Johnson filed a motion for a new trial, arguing that the district court's decision to try him in absentia was erroneous. The district court held extensive hearings on the issue and ultimately denied the motion in an exhaustive opinion.

Johnson's absence from the final weeks of his trial implicates constitutional, statutory, and commonlaw rights. Rule 43 of the Federal Rules of Criminal Procedure codifies these rights, including due process, the Confrontation Clause, and the commonlaw right to be present. *United States v. Navarro*, 169 F.3d 228, 236 (5th Cir. 1999). Under Rule 43, the defendant's presence is not necessary if he becomes "voluntarily absent" after the commencement of the trial. *Id.* We review the district court's determination that Johnson's absence was voluntary for clear error. *United States v. Davis*, 61 F.3d 291, 302 (5th Cir. 1995). If we conclude that he voluntarily waived his right to be present at his own trial, we then consider whether the district court abused its discretion in deciding that there was a controlling public interest in continuing with the trial in his absence. *See id.*

The district court concluded that Johnson's absence was voluntary based on its finding that he made a deliberate tactical decision to postpone the surgery in order to gain the perceived strategic advantage of going to verdict with Edwin Edwards. It clearly viewed Johnson's failure to keep it informed of his medical decisions as consistent with the strategy to avoid severance at all costs. In light of the fact that the surgery he had in March 2000 was virtually the same operation that had been scheduled in September 1999, the district court was also suspicious of the timing of Johnson's

31

decision, coming immediately after the government presented damaging evidence against him. Finally, it thought that his post-surgery legal maneuvers, including the shifting positions and his rejection of the district court's accommodations, were indicative of an unwillingness rather than an inability to continue with the trial.

Given the record evidence and the highly deferential standard under which we review the district court's determination, we cannot conclude that its finding of voluntary absence is clearly erroneous. In doing so, however, we note that Johnson's case presents a unique situation, not perfectly analogous to the caselaw relied on by either party. On one hand, several courts have considered scenarios wherein the defendant voluntarily absents himself from the trial by either exaggerating his symptoms or by exploiting a nonemergency condition in an obvious attempt to avoid trial. For example, in *United States v. Pastor*, 557 F.2d 930 (2d Cir. 1977), the Second Circuit based its conclusion that the defendant was voluntarily absent on its disbelief that he was experiencing the severe heart problems he claimed. *See id.* at 937 (concluding that defendant was "exaggerating his illness" in an effort to postpone the proceedings in his case). Similarly, in *United States v. Barton*, 647 F.2d 224 (2d Cir. 1981), the Second Circuit noted the disingenuous nature of the defendant's decision to undergo spinal surgery on the eve of trial despite the fact that his doctor had recommended the surgery seventeen months earlier. *See id.* at 238. The doctor stated that the operation was not performed on an emergency basis and that the defendant's request for surgery came "out of the blue." *Id.* Both of these cases are consistent with the law of our circuit, which holds that a defendant cannot avoid trial by misrepresenting or exploiting his medical condition. *See Davis*, 61 F.3d at 302-03 (holding that the defendant's absence was voluntary where her complaints of symptoms were not supported by medical records).

In another line of decisions, however, Rule 43 has been held to prevent the trial court from continuing with proceedings when a legitimate medical emergency renders the defendant unable to be present. Johnson relies heavily on *United States v. Novaton*, 271 F.3d 968, 994-95 (11th Cir. 2001), in which the trial court continued with the proceedings after one of the defendants fell ill. The Eleventh Circuit vacated the conviction and remanded for a new trial, finding clear error in the district court's determination that the defendant's absence was voluntary. *Id.* at 997. In so holding, the Eleventh Circuit noted that after the defendant became ill, he and his counsel "cooperated commendably with the government and the district court" before eventually moving for a mistrial. *Id.* Accordingly, under the *Novaton* standard, which we find entirely reasonable, a sudden, incapacitating illness can render a defendant involuntarily absent, especially when he cooperates with the trial court to minimize the disruptive effect of his condition.

Johnson's case does not fit neatly into either one of these lines of decisions. Unlike the defendants' symptoms in *Barton* and *Pastor*, Johnson's symptoms were not a bluff, nor did his decision to have surgery come "out of the blue." Johnson's doctors testified that although his symptoms were the same in March as in September, they had become more acute and his coronary disease had progressed. The doctors also acknowledged the effect that a stressful trial would have on Johnson's heart condition. Even after the surgery, there was no indication that he was faking his symptoms, as his doctor testified that they did not believe that he was malingering during the recovery period. The central distinction between Johnson's situation and the *Barton-Pastor* line, therefore, is that Johnson did not exploit his health condition to avoid a trial.

Nevertheless, this distinction does not make the district court's finding of voluntary absence clearly erroneous. There is ample support in the record for the district court's conclusion that

33

Johnson's reckless course of conduct was part of a deliberate, tactical effort to avoid severance. Pursuant to this strategy, he avoided surgery in September 1999 even though two cardiologists had recommended it. He never told the district court that the surgery had been scheduled or canceled, thereby leaving it in the dark about the seriousness of his condition. During the months preceding the trial, he failed to see a cardiologist, apparently out of fear that he would be advised yet again that surgery was necessary. This refusal to seek proper treatment and failure to keep the district court informed of his condition deprived it of the ability to take actions to prevent Johnson's condition from jeopardizing its management of a long, complex, multi-defendant trial. As a result of the lack of cooperation from Johnson, the district court was unaware that a severance might be necessary. At the very least, the district court was unable to take Johnson's condition into account when it was determining how best to schedule the presentation of evidence over the course of the trial.

Further supporting the district court's conclusion that Johnson's absence was the result of an informed trial strategy was his post-operation legal maneuvering. Following his decision to finally undergo surgery after the government had completed a very strong case against him, he repeatedly refused to cooperate with the district court to minimize the disruption that his operation had caused. After initially seeking a continuance, he then pursued what could arguably be described as a boycott strategy. He moved unsuccessfully for a mistrial and then refused every accommodation that the district court offered him. Moreover, despite the fact that the government's case against him had already been completed, he would not waive his presence even though he had done so on every other occasion. This lack of cooperation distinguishes the present case from *Novaton*, in which the defendant "cooperated commendably" with the trial court. *Novaton*, 271 F.3d at 997.

In essence, by the time Johnson finally left the trial for good, his absence was purely the result

34

of his own decision to avoid necessary medical treatment and his failure to keep the district court apprised of his condition. Furthermore, there is considerable evidence that these actions were part of a strategy to go to verdict with Edwin Edwards. Although Johnson has the right under Rule 43 to be present at his trial, he is not entitled to unilaterally dictate its time and circumstances. *See Davis*, 61 F.3d at 302 (quoting *United States v. Tortora*, 464 F.2d 1202, 1208 (2d Cir. 1972)). Otherwise, a defendant with a serious health condition like Johnson's would have the ability to get two bites at the apple by refusing necessary medical treatment before trial, waiting to gauge the strength of the government's presentation, and ultimately obtaining a mistrial if he then decided to have the treatment. As we decline to interpret Rule 43 as a tool for such tactical maneuvering, we hold that the district court's determination that Johnson's absence was voluntary is not clearly erroneous.

Furthermore, we have little difficulty concluding that the district court did not abuse its discretion in continuing with the proceedings in Johnson's absence. The district court painstakingly chronicled the great expense and time invested in this long, complex, multi-defendant trial up to the point of Johnson's departure. The trial was entering its third month, and the burdens which would have been placed on the witnesses, jurors, defendants, and the district court far exceeded the public interest in postponing the proceedings or conducting a separate trial with Johnson present. *See id.* at 303 (finding no abuse of discretion in continuing with complex, multi-defendant trial despite voluntarily absent defendant). Accordingly, perceiving no clear error in the district court's finding that Johnson was voluntarily absent, and discerning no abuse of discretion in its decision allowing the trial to proceed in his absence, we hold that there was no violation of Rule 43.

## VI.

35

Eleven days after the jury began its deliberations in this case, the court dismissed Juror 68. The events leading up to that dismissal are as follows:

Juror 68 first came to the district court's attention about midway through trial when it received an anonymous phone call (the "Bias Call") accusing Juror 68 of (1) talking about the case at church functions; (2) being involved with Edwin Edwards in a medical transportation business; (3) seeking counseling from his pastor about the verdict; and (4) having a bias against Edwin Edwards. The court questioned Juror 68 about the allegations and made an initial determination that they were baseless. After the United States Marshals were able to identify the anonymous callers, the district court made a testimonial record of the allegations and again concluded that the allegations were baseless. In dismissing Juror 68, the court explained that the Bias Call had nothing to do with his decision.

Other events occurring during trial were slightly more troubling. First, the court observed that Juror 68 had, contrary to the court's instructions, held onto a piece of transcript that was distributed during trial (the "Transcript Incident"). Second, the court noticed that Juror 68 had, contrary to the court's instructions, written his juror number on an evidence binder that was later re-used and handed to Edwin Edwards during his testimony (the "Binder Incident"). Despite these failures to follow the court's instructions, the court took no action, allowing deliberations to begin on April 24th.

On April 25th, a U.S. Marshal reported that he observed a dictionary and thesaurus in the jury room ("Dictionary Incident"). The court removed the books and re-instructed the jury not to bring any outside materials into the jury room. The court subsequently determined that it was Juror 68 who was responsible for bringing the books in and that the definitions of key terms, i.e., "conspiracy," "extortion" and "extort" were discussed. Again, the district court exercised restraint, declining to

36

take further action.[10]

On April 27th, the district court was informed that Juror 68 had left the jury room in tears. Per the court's instructions, Juror 68 wrote a note ("Jury Note 7"), asserting that he has "doubts" and that he is being "intimidated" by other jurors, and suggesting that perhaps he should be dismissed. Again demonstrating restraint, the court denied the government's motion to dismiss Juror 68 without interviewing any of the jurors, and re-instructed the jury regarding their duty to deliberate.

On May 1st, the court received a note signed by the Foreman ("Jury Note 11"), alleging that an unidentified juror was refusing to participate in deliberations. The court questioned the Foreman about Jury Note 11,[11] determining that the note was referring to Juror 68. When questioned about the note, the Foreman mentioned, in trying to explain the note's allegation that Juror 68 was biased, that other jurors had seen Juror 68 on one occasion bring a note into the jury room and on another occasion remove sheets from his notebook from the jury room. In addition, there was subsequent testimony that Juror 68 was referring to the note during deliberations. Understandably, the district court expressed great concern at the possibility that Juror 68 was again bringing extrinsic material into the jury room.

Accordingly, on May 2nd the court held a hearing to question Juror 68 about Jury Note 11. Without informing Juror 68 about the Foreman's testimony, the court also asked Juror 68 whether he brought any notes in or out of the jury room. Juror 68 responded in the negative. The district

---

[10]The district court noted that Juror 68 kept the dictionary at his work station despite the fact that another juror had told him that he was not supposed to use it.

[11]The note provided: "We feel a certain juror is biased and refuses to participate in deliberations. He has his mind made up, but will not discuss his reasoning. After many, many attempts by ALL jurors he still refuses. And he recently has gone as far as to tell a fellow juror to not speak to him at all. We do not know how to proceed with this juror's refusal to participate in deliberations."

court then interviewed the rest of the jurors about the two note incidents described by the Foreman; all but one of the jurors testified, in contradiction to Juror 68's testimony, to being aware of one or both of the incidents.

On May 3rd, over the prosecution's objection, the district court allowed Juror 68 an opportunity to explain the inconsistencies between his testimony and that of the fellow jurors. Juror 68 then partially recanted his previous testimony, admitting to bringing a note into the jury room and removing sheets from his notebook. In fact, he informed the court that, contrary to the court's instructions, he still had the note in his wallet. He explained that he remembered the two incidents after the court adjourned for the evening recess. But his recollection of the two incidents still differed materially from that of other jurors.

Following this testimony, the district court heard argument on the government's motion to dismiss Juror 68. As noted above, on May 5th the court dismissed Juror 68, issuing detailed findings of fact and conclusions of law. The district court based its dismissal of Juror 68 on its findings that Juror 68 had displayed an inability to follow the court's instructions and that, in his dealings with the court, Juror 68 was lacking in candor. With respect to the former finding, the district court cited the Binder Incident, the Transcript Incident, the April 25th dictionary incident and Juror 68's import and export of material from the jury room. With respect to the latter finding, the district court relied on his further finding that Juror 68 testified dishonestly on May 2nd when he denied importing and exporting material into the jury room. Finally, the district court made clear that it was not basing the dismissal on Juror 68's view of the evidence.

**A.**

District courts have discretion to dismiss jurors for just cause. *United States v. Fryar*, 867

F.2d 850, 853 (5th Cir. 1989). A district court abuses its discretion only "when its ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Whitehead v. Food Max of Miss., Inc.*, 277 F.3d 791, 792 (5th Cir. 2002); *see also United States v. Virgen-Moreno*, 265 F.3d 276, 288 (5th Cir. 2001) ("Unless the court's removal of the juror has prejudiced the defendant, we will not disturb the court's decision. Moreover, we will find prejudice only if the juror was discharged without factual support or for a legally irrelevant reason.") (citation omitted). Finally, "[u]nder the clearly erroneous standard, we may not reverse the district court's findings of fact unless the review of the relevant evidence leaves us with the definite and firm conviction that a mistake has been committed." *Broussard v. United States*, 989 F.2d 171, 178 (5th Cir. 1993).

The court found, based upon live testimony, that Juror 68 was unable to follow instructions and that he had displayed a lack of candor. The defendants do not contend that these two reasons for dismissal are legally irrelevant, *see Fryar*, 867 F.2d at 853 (affirming dismissal based on lack of candor); *United States v. Vega*, 72 F.3d 507, 512 (7th Cir. 1995) (affirming dismissal based on failure to follow instructions). Instead, they appear to contend that the "lack of candor" and "inability to follow instructions" findings are clearly erroneous. We disagree.

With respect to his lack of candor, in its May 5, 2000 statement of reasons for dismissing Juror 68, the district court noted that it asked Juror 68 on May 2, 2000 to disclose any material of any type whatsoever that he brought into or took out of the jury room and to describe each item with particularity. When answering these questions on May 2nd, Juror 68 did not disclose the two incidents described by the Foreman and the other jurors on May 1st and 2nd. He did disclose the incidents on May 3rd when he was recalled, but the district court observed that his testimony seemed coached, noting that "some of his statements yesterday came out of a case." In fact, the court

39

described Juror 68's May 3rd testimony as "shock[ing]." Furthermore, as noted above, Juror 68's

May 3rd description of the various incidents was still inconsistent with that of other jurors'.[12] These

inconsistencies also clearly support the "lack of candor" finding. Finally, the district court was rightly

concerned with the fact that Juror 68 failed to correct his earlier misstatements until recalled and

questioned by the court. Accordingly, we cannot say that the district court's finding of fact is clearly

erroneous.

With respect to Juror 68's inability or unwillingness to follow instructions, the defendants

apparently concede that his behavior with respect to the Dictionary Incident, Transcript Incident,

Binder Incident and note incidents constituted a failure to follow instructions. The defendants argue,

however, that these mistakes were innocent, understandable and harmless. In light of the standard

of review, their concession is fatal, regardless of their personal view of the seriousness of Juror 68's

infractions.[13] Collectively, these failures to follow the court instructions, in addition to any

observations the court may have made respecting Juror 68's demeanor, clearly support the district

court's factual finding that Juror 68 was unable to follow its instructions.

Alternatively, the defendants vigorously contend that the abuse of discretion standard should

not apply to dismissals occurring after commencement of deliberation. They argue that we should

adopt a much more stringent standard in such cases, reversing whenever there is "a possibility that

the dismissal was prompted by the juror's doubts about the defendant's guilt." In support of this

---

[12]For example, Juror 68 testified that he brought back all papers that he took out of the jury room. Other jurors testified that he brought back fewer pages. After observing the testimony, the district court expressly found the other jurors' version more credible.

[13]Perhaps the strongest evidence of Juror 68's inability to follow instructions is the fact that, even after all of the questions about taking notes in and out of the jury room, Juror 68 continued to keep a note in his wallet.

proposition, the defendants rely primarily on *United States v. Brown*, 823 F.2d 591 (D.C. Cir. 1987),

*United v. Thomas*, 116 F.3d 606 (2d Cir. 1997) and *United States v. Symington*, 195 F.3d 1080 (9th

Cir. 1990).  Their reliance on these cases is misplaced; the holdings are not nearly so broad.

*Brown* and *Thomas*[14] are "jury nullification"[15] dismissals.  In both, the district court dismissed

a juror during deliberations, concluding that juror was refusing to apply the substantive law.  *Brown*,

823 F.2d at 595; *Thomas*, 116 F.3d at 611-12.  After reviewing the records, the D.C. Circuit and

Second Circuit, respectively, reversed, concluding that the evidence revealed a "substantial

possibility" that the juror was motivated not by a desire to nullify, but by legitimate concerns about

the sufficiency of the evidence. *Brown*, 823 F.2d at 596; *Thomas*, 116 F.3d at 623.  These courts

reasoned that the "substantial possibility" rule was necessary for nullification-based dismissals

because, due to the sanctity of jury deliberations, the court will generally be unable to determine the

true nature of the juror's difficulty.  *Brown*, 823 F.3d at 596; *Thomas*, 116 F.3d at 622 ("Given the

necessary limitations on a court's investigatory authority in cases involving a juror's alleged refusal

to follow the law, a lower evidentiary standard could lead to the removal of jurors on the basis of

their view of the sufficiency of the prosecution's evidence.").

In *Symington*, the Ninth Circuit, relying on *Brown* and *Thomas*, reversed a district court's

juror dismissal that rested on the juror's refusal to deliberate, concluding that a reasonable possibility

---

[14]*Thomas* relies substantially on *Brown*.  *See Thomas*, 115 F.3d at 622 ("We adopt the *Brown* rule as an appropriate limitation on a juror's dismissal in any case where the juror allegedly refuses to follow the law--whether the juror himself requests to be discharged from duty or, as in the instant case, fellow jurors raise allegations of this form of misconduct.").

[15]Black's Law Dictionary defines jury nullification as "a jur[or's] knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jur[or's] sense of justice, morality, or fairness."  Black's Law Dictionary 862 (7th ed. 1999).

existed that the other jurors' problems with the dismissed juror were based upon that juror's view on the sufficiency of the evidence. *Id.* at 1088. As the government notes in its brief, however, the court in *Symington* also specifically emphasized the narrow nature of its holding:

> Cases subject to [reasonable probability] rule, we emphasize, are infrequent. In general, questions of juror bias or competence focus on some event...that is both easily identifiable and subject to investigation and findings without intrusion into the deliberative process. In those cases, the presiding judge can make appropriate findings and establish whether a juror is biased or otherwise unable to serve without delving into the reasons underlying the juror's views on the merits of the case. Since the district court's investigative authority is not constrained by the same jury secrecy concerns in those cases, the rule we announce here is not triggered. In cases where the allegations go to the quality and coherence of the juror's views on the merits, however, a trial judge may not be able to assess the juror's competence without exposing the content of the juror's views. The rule we announce today applies only to those cases.

*Symington*, 195 F.3d at 1087 n.6.

As the discussion of the cases above illustrates, *Brown*, *Thomas* and *Symington* stand for the limited proposition that a court may not dismiss a juror based upon its conclusion that the juror is failing to participate in the deliberative process in accordance with law unless there is no possibility that the juror's problem stems from his view of the sufficiency of the evidence. Even at its broadest, the reasoning of these cases extends only to those dismissals where the juror's conduct cannot be evaluated without delving into the reasons underlying the jurors' views of the case, i.e., where the deliberative process has been implicated. As the dismissal in this case clearly did not require evaluation of such evidence, and in fact the district court took great pains to protect jury secrecy, the *Brown*, *Thomas* and *Symington* rule is inapplicable.

Alternatively, the defendants may contend that the focus should be on the motivation of the judge or party in initiating dismissal proceedings, i.e., dismissal is inappropriate whenever the court or a party initiates a motion to dismiss a juror based upon that juror's evaluation of the evidence.

With respect to the latter, we do not suggest that the incentives of the parties seeking dismissal have no relevance, but we reject any suggestion that they are in any manner controlling. We assume that most litigants, while respecting their duty to the court, actively seek dismissal only of those jurors that they believe are adverse to their client's case. The motivation rule would functionally invalidate every party-initiated dismissal. As to the former, having carefully reviewed the entire record, we find no evidence that the district court dismissed Juror 68 for any reason other than those given.

**B.**

The defendants also assert that the district court's investigation of Juror 68's improper conduct was too broad in scope. Specifically, they appear to contend that once the district court had any inkling that the jurors were having trouble with Juror 68 because of his view of the evidence, any inquiry into his misconduct should have stopped. The defendants have cited no authority or provided any rationale for this proposition; as no rationale for it is apparent, we decline to adopt it.[16] While we recognize the district court's duty to protect the secrecy of jury deliberations, the district court continues to enjoy wide discretion to determine the proper scope of an investigation into whether just cause to dismiss a juror exists as long as the content of the deliberations is left undisturbed. *See Fryar*, 867 F.2d at 854; *cf. Thomas*, 116 F.3d at 623 ("Where the duty and authority to prevent defiant disregard of the law or evidence comes into conflict with the principle of secret jury deliberations, we are compelled to err in favor of the lesser of two evils--protecting the secrecy of jury deliberations at the expense of possibly allowing irresponsible juror activity.").

---

[16]The defendants do not explain or provide any authority for the proposition that a party's intent in seeking a dismissal should be controlling. They again cite to *Brown* and *Thomas*, but they do not explain their relevance. *Brown* and *Thomas* do note, and we agree, that district courts must be careful not to jeopardize the secrecy of deliberations by delving into the thought processes of the jurors. *See Thomas*, 116 F.3d at 618; *Brown*, 823 F.3d at 596. But the district court was very careful; it insisted that the jurors refrain from describing the content and method of their deliberations.

We conclude that the district court's investigation was not so broad in scope as to constitute an abuse of discretion. The district court did not interview any jurors until it received, on May 1st, the ambiguous Note 11 signed by the Foreman. As this was the second note indicating problems and the first including allegations of juror bias, it would seem the court was acting well within its discretion in attempting to determine what the problems were. It was in the process of interviewing the Foreman about the bias allegations that the district court discovered that Juror 68 was again violating the court's instructions. Understandably, the defendants do not contend that the court lacked discretion to investigate this evidence of misconduct.

## C.

Finally, we note that there is a great deal of discussion in the briefs about whether Juror 68 was or was not a "hold-out" juror. This discussion is inapposite. Even assuming that Juror 68 was a hold-out juror, we have previously made clear that hold-out jurors are not immune from dismissal based upon just cause, *see United States v. Huntress*, 956 F.2d 1309, 1312-13 (5th Cir. 1992) ("*Wilson* in no way stands for the proposition that any evidence that the juror was a holdout raises a red flag.") (citing *United States v. Wilson*, 894 F.2d 1245, 1250 (11th Cir. 1990)), and the district court expressly disavowed any possibility that Juror 68 was being dismissed because of his view of the evidence. The defendants' implied assertion to the contrary is at best rank speculation. Accordingly, and in light of the discussion above, neither the dismissal of Juror 68 nor the investigation that led up to it provides a basis for reversal.

## VII.

Brown, Johnson, and Stephen Edwards contend that there was insufficient evidence to support their convictions. At the district court, they moved for acquittal under Fed. R. Crim. P. 29,

and we review the denial of that motion de novo. *United States v. Alarcon*, 261 F.3d 416, 421 (5th Cir. 2001). We must decide whether, viewing the evidence in the light most favorable to the government, a rational factfinder could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Williams*, 264 F.3d 561, 576 (5th Cir. 2001). We focus, therefore, on whether the verdict was reasonable, not whether we believe it is correct. *Id.*

## A.

Brown challenges the sufficiency of the evidence supporting his extortion convictions, which also provided the basis for his RICO and RICO conspiracy convictions. Specifically, he argues that the evidence was insufficient on both of the government's extortion theories: extortion under color of official right and extortion by wrongful use of fear. Regarding the extortion under color of official right, Brown notes that in the usual case, this type of extortion is limited to the acts of public officials. *See United States v. Tomblin*, 46 F.3d 1369, 1382 (5th Cir. 1995). In cases where it has been applied to private persons, the conduct involved masquerading as a public official or aiding and abetting a public official's receipt of money. *See id.* Brown argues that there was no evidence that he either masqueraded as a public official or aided and abetted Governor Edwards' receipt of the money. Our review of the record, however, reveals ample evidence on which the jury could have reasonably based its verdict. Brown brought principals of LRGC/NORC to the Governor's Mansion to meet Edwin Edwards on several occasions. Moreover, Edwin Edwards assured them that "Cecil speaks for me," and "I will pass along any information through Cecil." These representations provided sufficient evidence for the jury to conclude that Brown's threats were made under color of official right.

The jury also had sufficient evidence on the theory of extortion by wrongful use of fear.[17]

---

[17]Brown challenges the sufficiency of the evidence in support of the extortion charges relating to both the Jazz and LRGC/NORC schemes. His challenge to the extortion by wrongful use of fear relating

45

Extortion by wrongful use of fear includes fear of economic harm. *Id.* at 1384. This harm must take the form of a particular economic loss, not merely the loss of a potential benefit. *Id.* Brown argues that he did not exploit LRGC/NORC's fear of not receiving a license, as the evidence merely demonstrates that LRGC/NORC willingly paid him in the hope of receiving an extra benefit not available to others. He analogizes the situation to the facts of *United States v. Garcia*, 907 F.2d 380, 385 (2d Cir. 1990), in which the Second Circuit reasoned that a congressman who had taken money from a company could not be convicted of extortion absent any evidence that the company was making the payments out of fear. By paying the congressman, the Second Circuit held, the victim "was purchasing an advocate, not buying off a thug." *Id.* at 384. This was "not the stuff of which extortion is made." *Id.* at 385.

We disagree that this case is similar to *Garcia.* Instead, we find *United States v. Collins*, 78 F.3d 1021 (6th Cir. 1996), more instructive. In *Collins*, the Sixth Circuit refused to follow *Garcia* in light of evidence that the persons making the payments had indeed acted out of fear. *Id.* at 1030-31. Similarly, in the present case, the jury had ample evidence that the victims were acting out of fear of economic loss. For example, it could have credited the testimony of several persons who stated that as a result of Brown's threats, they believed that they would not even have an opportunity to obtain a license. One such person, Allan Morse, testified that: "[W]e all felt the same way. Everybody at every meeting felt that if these payments were not made, then it would automatically shut off any chance that we would receive a license." In light of this evidence we conclude that this is not a situation like *Garcia*, in which the payees were merely attempting to obtain preferential access and thought that, even without the payments, they would have a fair opportunity to compete for the

---

to the Jazz scheme is identical to Johnson's argument and fails for the same reasons. *See infra*, Part VII.B.

license.  To the contrary, unlike *Garcia*, this is the stuff of which extortion is made.[18]

Brown also attacks his mail and wire fraud convictions by arguing that there was no fraud because when he promised a license to LRGC/NORC, he firmly believed that he could deliver.  In particular, he cites the testimony of Russ Meyer, the president of LRGC, who said that "he was absolutely convinced that what he was saying was a hundred percent true.  I believe that Cecil felt at that time he was able to deliver what he said he could."  This argument, however, overlooks the substantial evidence of fraud in his dealings with LRGC/NORC.  Such evidence of deceit includes: (1) in January 1993, Brown convinced LRGC/NORC that they would receive not one, but two licenses in order to extract another $150,000 from the principals, (2) just days before the Gaming Commission vote, Brown surreptitiously entered into a "consulting agreement" with a competing applicant, promising that applicant a license, and (3) prior to the awarding of certificates of preliminary approval, Brown informed the companies that they would not be receiving a license because Governor Edwards simply had "too many friends."  Given this evidence, we conclude that the jury's verdict should stand.

**B.**

Like Brown, Johnson argues that the evidence supporting the government's theory of extortion by wrongful use of fear relating to the Jazz scheme was insufficient.  He contends that, at most, Jazz principals were placed in fear of the loss of a potential economic benefit, which is insufficient to support an extortion conviction.  *See Tomblin*, 46 F.3d at 1384 (stating that "fear of losing a potential benefit does not suffice").  As with Brown, this argument is unavailing.  The jury

---

[18]Brown's attack on his Travel Act conviction also fails for these same reasons.  The basis of the Travel Act conviction is that Brown engaged in interstate travel in order to carry out his extortion.  He does not dispute that he traveled to Missouri, only whether his actions constituted extortion.  As his extortion challenge is unpersuasive, his attack on the Travel Act conviction fails.

had ample evidence that Johnson capitalized on Jazz's fear that by not making the payments, it would lose the right to compete at all, not merely preferential treatment in an otherwise fair competition. For example, the jury heard Johnson threaten Jazz that if it did not give him a 12.5% cut, "that was all there was to it. You gone with Edwin. . . . And you know it too and [expletive] you'll be walking the streets." He also stated, "I just hate to see you all lose the license. I mean it's gone and you can write that off you know." At one point, Johnson brought Brown to meet Bradley and introduced Brown as his "partner." He renewed his demand of 12.5%, and pointed to Brown, saying, "You wasn't gonna get none, you was gone, 'til I got in there and got him involved." Bradley testified that he interpreted Johnson's and Brown's statements as threats that Jazz would not receive a license if it did not pay. Based on this evidence, the jury's verdict regarding the Jazz scheme extortion was well supported. Similarly, Johnson's Travel Act conviction, which he attacks on the same grounds, was supported by sufficient evidence of fear of economic loss.

Johnson also challenges the sufficiency of the evidence relating to his false statements conviction. To establish a false statements violation under 18 U.S.C. § 1001, the government must prove that a statement is false and material. *See United States v. Wright*, 211 F.3d 233, 238 (5th Cir. 2000). Although he does not dispute the jury's finding of falsity, Johnson argues that there was insufficient evidence of materiality. Succinctly stated, his argument is that materiality is lacking because the government never believed his lies. He contends that the FBI was already familiar with the tapes of Johnson's statements by the time FBI Agent Rossman, to whom the statements were made, became involved in the Jazz investigation. In light of these tapes, Johnson's claims about Bradley were immediately known to be false and never had the effect of actually deceiving Agent Rossman. It is not necessary, however, for the misrepresentations to "have influenced the actions of

48

the Government agency, and the Government agents need not have been actually deceived." *United States v. Markham*, 537 F.2d 187, 196 (5th Cir. 1976). The statements must only "have the natural tendency or capacity to deceive, affect, or influence the federal agency." *United States v. Sidhu*, 130 F.3d 644, 650 (5th Cir. 1997) (holding that false exculpatory statements can support conviction under § 1001). Our review of the record reveals that the jury had sufficient evidence to reach its conclusion that Johnson's statements were material. Agent Rossman testified that Johnson lied about issues central to the investigation, covered up his involvement, and attacked the credibility of a cooperating witness. In light of this testimony, the evidence was sufficient to support the false statements conviction.

## C.

Stephen Edwards challenges the sufficiency of the evidence supporting his conviction for extortion as well as aiding and abetting in relation to the 15th Riverboat license, which involved the extortion of DeBartolo. DeBartolo and his business partner, Ed Muransky ("Muransky"), had formed DeBartolo Entertainment Corp. and entered into a joint venture with Hollywood Casino to apply for the last license. DeBartolo testified at trial that on the evening of March 5, 1997, the day before his final presentation to the Gaming Control Board, he met with Edwin Edwards at the Radisson Hotel. Edwin Edwards gave him a piece of paper, on which he had written the figure of $400,000, and told him that without the payment there would be a serious problem with the license. DeBartolo paid the $400,000 on March 12, 1997, the day before the Board was to vote. The next morning, Edwin Edwards called to inform him that the Board had voted unanimously in favor of his application.

To be convicted of aiding and abetting, Stephen Edwards must have associated with the criminal venture, purposefully participated in it, and sought by his actions to make it succeed. *United*

*States v. Vaden*, 912 F.2d 780, 783 (5th Cir. 1990). "An aider and abettor is liable for criminal acts that are the "'natural or probable consequence of the crime' that he counseled, commanded, or otherwise encouraged." *Id.* (quoting *United States v. Fagan*, 821 F.2d 1002, 1012 (5th Cir. 1987)). Stephen Edwards contends that there was no evidence that he committed any act or affirmative conduct that aided the extortion of DeBartolo. Relying on testimony by both DeBartolo and Muransky, he contends that the only proposal possibly rising to the level of extortion was the March 5, 1997 request, in which Stephen Edwards did not directly participate.

Despite Stephen Edwards' absence from the March 5, 1997 meeting, the evidence supports the government's contention that the meeting represented only the culmination of an ongoing scheme to extort DeBartolo. In Sept ember 1996, Stephen Edwards sent a "consulting agreement" to DeBartolo and Muransky that provided for payment to Stephen Edwards of a monthly $50,000 fee over a renewable five-year term. DeBartolo and Muransky refused to pay such an exorbitant fee and tore up the proposed agreement. After the March meeting, however, Edwin Edwards sent DeBartolo a retainer agreement under which Stephen Edwards would be paid $10,000 per month. The government characterized this as a sham arrangement to funnel payments to Edwin Edwards and Stephen Edwards. Indeed, DeBartolo's testimony supported this interpretation, as he stated that at the time he had no need for more lawyers or legal services.

Stephen Edwards dismisses the effect of these two consulting agreements. Regarding the first proposed contract, he notes that DeBartolo rejected it without subsequent threats from Edwin Edwards or Stephen Edwards. There was no fear, therefore, of reprisals and consequently no extortion. As for the second agreement, Stephen Edwards points to the testimony of Muransky, who admitted that St ephen Edwards did provide some services and was probably entitled to some

50

payment. These arguments are ultimately unpersuasive. We need not consider whether either one of the agreements, standing alone, might be insufficient to constitute extortion. Rather, the question we must answer is whether Stephen Edwards' involvement in these "sham" agreements entitled the jury to infer his knowledge of and participation in the entire scheme, which culminated in the $400,000 demand. In this respect, the evidence is sufficient. Both before the actual demand and immediately afterwards, DeBartolo was asked to sign agreements for services he did not need at a price that was unreasonable. The jury could have concluded that these agreements, which directly benefitted Stephen Edwards, were part of the scheme to extort DeBartolo. Moreover, there was evidence that Edwin Edwards and Stephen Edwards worked in close cooperation on the 15th Riverboat Scheme, such as a taped conversation during which Edwin Edwards told Stephen Edwards on March 10, 1997: "we've come to the point now where if this thing is gonna work we have to have an understanding . . . and I want to tell him that I want one percent of gross gaming revenue as defined by the statute." In light of this evidence and the deferential sufficiency standard, we conclude that the jury's verdict should stand.

## VIII.

As noted above, the district court, relying on *Cleveland*, dismissed Counts 20-22 and 25-27 after the jury verdict as against Edwin Edwards and Stephen Edwards. Martin, Brown and Johnson were not charged with these Counts. Count 20 charged Edwin Edwards and Stephen Edwards with a mail and wire fraud conspiracy. Counts 21-22 and 25-26 charged Edwin Edwards and Stephen Edwards with wire fraud and Count 27 charged Edwin Edwards and Stephen Edwards with mail fraud. All of these counts related to the 15th Riverboat License Scheme. Again relying on *Cleveland*, the district court dismissed Count 6 as against Johnson. Edwin Edwards was acquitted

51

on this charge; Martin, Brown and Stephen Edwards were not charged. Count 6 related to the Jazz Scheme.

Predicate act "5A" of Count 1, the RICO count, corresponds to Count 21. Predicate act "5B" corresponds to Count 22. Predicate act "5E" corresponds to Count 25. Predicate act "5F" corresponds to Count 26. Predicate act "5G" corresponds to Count 27. Predicate act "6" corresponds to Count 34.

The defendants contend that their convictions were tainted by evidence that would have been inadmissible "but for" the counts premised upon the "license as property" theory rejected by *Cleveland*, i.e., there was a prejudicial spillover effect.

In the alternative, they argue that the dismissal of the mail and wire fraud counts [Counts 20-22 and 25-27] pursuant to *Cleveland* also requires dismissal of the money laundering count [Count 34], because the jury could have relied upon Counts 20-22 and 25-27 in concluding that the money used in the financial transaction underlying Count 34 involved the proceeds of unlawful activity. In addition, the defendants contend that the jury verdict on the RICO and RICO conspiracy counts [Counts 1 and 2] is tainted and must be reversed because the jury may have relied on predicate acts 5A-B, 5E-G and 6 in concluding that the defendants conducted the affairs of their RICO enterprise through a pattern of racketeering activity.

Finally, Martin contends that his own conviction on Counts 1 and 2 must be reversed because the jury only found him responsible for two predicate acts, one of which was Count 34 [predicate act 6].

**A.**

Both the government and the defendants fail to suggest a standard for reviewing the

"spillover" claim or cite any Fifth Circuit "spillover" cases.[19]  Generally, this Court uses the term

"spillover" in discussing whether a district court abused its discretion in denying a motion for

severance.  *See, e.g.*, *United States v. Peterson*, 244 F.3d 385, 393 (5th Cir. 2001) (noting that to be

entitled to reversal in this context "the defendant must show that:  (1) the joint trial prejudiced him

to such an extent that the district court could not provide adequate protection; and (2) the prejudice

outweighed the government's interest in economy of judicial administration."); *United States v.*

*Pofahl*, 990 F.2d 1456, 1483 (5th Cir. 1993) (noting in this context that "the mere presence of a

spillover effect does not ordinarily warrant severance").  This circuit has never addressed whether

spillover from invalid claims can be a basis for granting a new trial.  *Compare United States v.*

*Vebeliunas*, 76 F.3d 1283, 1293 (2d Cir. 1996) (applying a three-factor test to this type of

"retroactive misjoinder" challenge to determine whether the defendant was prejudiced and noting

"[i]n cases where the vacated and remaining counts emanate from similar facts, and the evidence

introduced would have been admissible as to both, it is difficult for a defendant to make a showing

of prejudicial spillover."), *United States v. Murphy*, 836 F.2d 248, 255-56 (6th Cir. 1988) (finding

no prejudice where remaining convictions were "conceptually a[nd] totally separate type of crime"),

*United States v. Stefan*, 784 F.2d 1093, 1101 (11th Cir. 1986) (applying two-factor test) *with United*

*States v. Holzer*, 840 F.2d 1343, 1349 (7th Cir. 1988) ("No rule of evidence is violated by the

admission of evidence concerning a crime of which the defendant is acquitted, provided the crime was

---

[19]The defendants do cite two cases in support of their argument: *United States v. DiNome*, 954 F.2d 839 (2d Cir. 1992); *United States v. Tellier*, 83 F.3d 578, 582 (2d Cir. 1996)(citing *DiNome*). Neither cases, however, provides a standard of review for a "spillover" challenge and each is distinguishable from the present case. *See Tellier*, 83 F.3d at 581-582 (reversing a Hobbs act claim, citing prejudicial "spillover" where evidence on unproved RICO counts should not have been admitted); *DiNome*, 954 F.2d at 844-845 (noting that typically "spillover" is a term used in the severance context and concluding that the defendants' trial should have been severed after the court granted a Rule 29 motion on RICO claims where the RICO evidence would not have been otherwise inadmissible against them).

properly joined to the crime for which he was convicted and the crimes did not have to be severed for purposes of trial. It makes no difference, moreover, whether the jury acquits on some counts or the trial or reviewing court sets aside the conviction."). While we are willing to acknowledge that perhaps a grant of a new trial might be appropriate in some cases of "retroactive misjoinder," that case is not before us. At a minimum, drawing from our severance cases and authority from other circuits, the defendants must show that they experienced some prejudice as a result of the joinder of the invalid claims, i.e., that otherwise inadmissible evidence was admitted to prove the invalid fraud claims. They have not, and cannot do so. Any evidence admitted on these counts, presumably evidence that Edwin and Stephen Edwards were attempting to influence the 15th Riverboat License vote, was clearly relevant to the extortion counts; the fact that the defendants were manipulating the licensing process tends to prove that they promised those they extorted that they would do so.[20] Furthermore, it was admissible on the government's honest services theory. Finally, though unnecessary, this evidence was also admissible as against Martin because the 15th Riverboat License extortion scheme was part of the RICO conspiracy, of which Martin was charged and convicted. *Cf. Salinas v. United States*, 522 U.S. 52, 64 (1997) (holding that individual co-conspirator does not need to personally commit predicate acts to be convicted of a RICO conspiracy).

**B.**

At the close of evidence, the district court instructed the jury that it could convict the defendants on Count 34 if it found, in part, that he knowingly conducted a financial transaction

---

[20]*Cf. United States v. Holzer*, 840 F.2d 1343, 1349 (7th Cir. 1988) ("No rule of evidence is violated by the admission of evidence concerning a crime of which the defendant is acquitted, provided the crime was properly joined to the crime for which he was convicted and the crimes did not have to be severed for purposes of trial. It makes no difference, moreover, whether the jury acquits on some counts or the trial or reviewing court sets aside the conviction.").

involving the proceeds of extortion, mail fraud or wire fraud. In addition, the district court instructed the jury as to Counts 21-26 and 28-30 that it could convict Edwin Edwards, Stephen Edwards, Gregory Tarver and Ecotry Fuller of wire fraud on a "license as property" theory, i.e., if it found, in part, that they knowingly devised a scheme to deprive the State of Louisiana of property by obtaining the 15th Riverboat License by means of false or fraudulent pretenses. Accordingly, at least in theory, the jury was instructed that it could convict the defendants on Count 34 if it found that they knowingly conducted a financial transaction involving the proceeds of a "license as property" fraud. Therefore, in light of *Cleveland*, part of the Count 34 instruction was legally invalid.

However, the defendants do not identify a place in the record where they objected to the money laundering instruction,[21] and our independent review of the record has found no objection. Accordingly, we review the challenge only for "plain error." *See United States v. Jimenez*, 256 F.3d 330, 340 (5th Cir. 2001); Fed. R. Crim. P. 30; Fed. R. Crim. P. 52; *see e.g. Johnson v. United States*, 520 U.S. 461 (1997) (reviewing faulty instruction for plain error despite the fact that settled law at the time of trial supported the instruction).

"We follow a four step analysis for 'plain error' review: (1) there must be an 'error,' i.e., a 'deviation from a legal rule,' that has not been waived; (2) the error must be 'plain,' i.e., 'clear' or 'obvious' under current law; (3) the error must 'affect substantial rights,' i.e., it must have affected the outcome of the proceeding; and, (4) even if the error was 'plain' and 'affected substantial rights,' the Court of Appeals, exercising its discretion, should correct the error only if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Burton*,

---

[21]The defendants cite to a pretrial motion to dismiss filed by Tarver. Even assuming, *arguendo*, that this motion, filed September 15, 1999, could have properly raised an objection to the jury instructions given on April 24, 2000, the motion did not mention Count 34. This is not surprising in light of the fact that Tarver was not charged with money laundering.

126 F.3d 666, 674 (5th Cir. 1997).

This circuit recognizes that a conviction must be reversed when disjunctive legal theories, one of which is legally insufficient, are submitted to the jury, the jury renders a general verdict of guilty and it is impossible to tell which ground the jury selected. *See Tomblin*, 46 F.3d at 1385; *cf. Yates v. United States*, 354 U.S. 298, 312 (1957) (originating the doctrine), *overruled on other grounds in Burks v. United States*, 437 U.S. 1 (1978).

However, *Yates* does not control every instance where a disjunctive instruction with a legally insufficient component is given. In *Griffin v. United States*, 502 U.S. 46 (1991), the Court held that a conviction should stand where a jury is instructed that it can convict on two theories, one of which is unsupported by the evidence. It reasoned:

> Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law--whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence.

*Griffin*, 502 U.S. at 59.

In *United States v. Wilson*, 116 F.3d 1066, *reversed on other grounds United States v. Brown*, 161 F.3d 256, 257 n.1 (5th Cir. 1998) (en banc), we held that *Griffin*, not *Yates*, applies where a disjunctive instruction with a factually insufficient component is given, even if that component is also legally insufficient. *Wilson*, 116 F.3d at 1080; *see also Yates*, 354 U.S. at 312 ("In these circumstances we think the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, *and it is impossible to tell which ground the jury selected*.") (emphasis added). That is exactly what we have here. The

defendants have never identified, despite the government's urging, any evidence in the record that would have supported a jury finding that they laundered the proceeds of a "license of property" fraud scheme,[22] and our independent review of the record has found none. Accordingly, we find no reversible error, plain or otherwise.

## C.

To restate, the defendants contend that reversal is required as a matter of law where the jury finds a pattern of racketeering based, in part, on predicate acts that have not been proven. This proposition has already been rejected by this circuit. *See United States v. Peacock*, 654 F.2d 339, 348, *vacated in part on other grounds*, 686 F.2d 356 (5th Cir. 1982); *see also Brennan v. United States*, 867 F.2d 111, 114-16 (2d Cir. 1989); *United States v. Cardall*, 885 F.2d 656, 682 (10th Cir. 1989); *United States v. Pepe*, 747 F.2d 632, 665-68 (11th Cir. 1984).

*United States v. Marcello*, 876 F2d 1147 (5th Cir. 1989), cited by the defendants, is distinguishable. In *Marcello*, it was impossible for the panel to determine whether the jury found two valid predicate acts because the jury returned a general verdict. *Id.* at 1153. That is not the case here. The jury in this case was given a special verdict form with respect to the RICO counts. In addition to predicate acts 5A-B, 5E-G (those tainted by the "license as property" theory), the jury expressly found proven predicate acts 4A, 4B and 4C and 6 as to Stephen Edwards, Edwin Edwards and Martin and predicate acts 3A, 3B, 3C and 3D as to Edwin Edwards and Stephen Edwards. *Cf.*

---

[22]The defendants effectively conceded this point before the district court. In their reply to the government's assertion in its post-verdict memorandum on the effect of *Cleveland* that no such evidence existed, the defendants wrote only "If the government now takes the position that it was impossible for the jury to base its money laundering verdict on the mail and wire fraud related counts, then why did the Government present that theory to the grand jury in the indictment and why did the grand jury decide to accept that theory and charge the mail and wire fraud related counts as one of the sources of the laundered funds?".

*United States v. Biaggi*, 909 F.2d 662, 692 (recognizing that "the jury's findings of two predicate acts, lawfully constituting a RICO pattern, and of the other elements of a RICO offense, will permit affirmance of a RICO conviction notwithstanding the invalidation of other predicate acts" but concluding, without citing authority or providing reasoning, that affirmance was inappropriate because in their case the invalid allegations "dominated this prosecution."); *United States v. Delano*, 55 F.3d 720, 728 (2d Cir. 1992) (same) (citing *Biaggi*).

### D.

Finally, Martin contends that reversal of his Count 34 conviction requires that his RICO convictions be reversed because the jury will have found him to have committed only one Racketeering Act. This argument is wholly dependant on our reversal of Martin's conviction on Count 34. Because we will affirm Martin's Count 34 conviction, his argument fails. We note, however, that even had we reversed Martin's conviction on Count 34, his RICO conspiracy conviction clearly would have been unaffected. *See Salinas*, 522 U.S. at 64.[23]

### IX.

Pursuant to a special verdict form, the district court found Stephen Edwards jointly and severally liable for a $1.8 million forfeiture award. Of that $1.8 million, $327,000 was attributed to the LRGC/NORC scheme. The jury had earlier found that the government had failed to prove any predicate acts relating to the LGRC/NORC scheme as to Stephen Edwards or Edwin Edwards.

At sentencing the district court, applying U.S.S.G. §§ 2C1.1 & 2F1.1, concluded that the loss

---

[23]Johnson also contends that *Cleveland* invalidates his extortion conviction because after *Cleveland*, loss of a license is not an economic harm. We reject this unsupported assertion. *Cleveland* has nothing to do with extortion and therefore has no effect on the law respecting what constitutes a threat of economic harm. As discussed above, the inability to compete for a license clearly constitutes an economic loss regardless of whether a license is property in the hands of the government. *See Collins*, 78 F.3d at 1030-31.

attributable to Stephen Edwards was $4,117,000, resulting in an upward adjustment of 13 levels. Of this $4,117,000, $2,217,000 was attributed to the Players Scheme and $1.9 million was attributed to the other schemes.[24] The $2,217,000 figure included $200,000 that was allegedly extorted from Patrick Madamba, $180,000 paid in legal fees to Stephen Edwards and payments (of some amount not specified by the briefs) made to Shetler by "Jebaco" and "Beeber." All of the money attributed to the Players Scheme (except the $180,000 in legal fees aforementioned) was paid first to Shetler; at Shetler's sentencing, Judge Parker found Shetler responsible only for between $300,000 and $500,000 in loss.

Stephen Edwards contends that it would violate his Fifth Amendment right to due process and Eighth Amendment protection against excessive fines to base a forfeiture order on conduct that the jury found "not proven."

Stephen Edwards further contends that the $2,217,000 figure was overstated. In support of this contention, he asserts that it is inconsistent for Judge Parker to find $300,000 to $500,000 in loss from the Players Scheme and Judge Polozola to find $2,217,000. In addition, Stephen Edwards asserts that the record does not support a finding that the three classes of payments mentioned above (the Madamba payments, legal fee payments, and Jebaco and Beeber payments) were the proceeds of illegal activity.

## A.

The $1.8 million forfeiture amount constitutes the amount the jury found to have been the proceeds of racketeering activity. Stephen Edwards was found to have been a member of that

---

[24]The sum of $1.5 million was attributed to the Treasure Chest Scheme, consisting of an intended 15 monthly payments of $100,000. Four hundred thousand dollars was attributed to the 15th Riverboat License Scheme. Though unchallenged, these amounts are supported by the record.

racketeering conspiracy. Accordingly, the district court appropriately entered an order of forfeiture, for which Stephen Edwards was solidarily liable. See *United States v. Corrado*, 286 F.3d 934, 937-38 (6th Cir. 2002) (*Corrado II*) (holding that a RICO forfeiture verdict may provide for joint and several liability and that conspirators are liable even for proceeds of crimes not part of the conspiratorial enterprise); *see also United States v. Simmons*, 154 F.3d 765, 769-770 (8th Cir. 1998) (providing for joint and several liability); *United States v. Hurley*, 63 F.3d 1, 22 (1st Cir. 1995) (same); *United States v. Caporale*, 806 F.2d 1487, 1507 (11th Cir. 1986) (same).

Contrary to his assertion, Stephen Edwards is not being punished for committing the substantive acts found to be "not proven." He is being punished for conducting the affairs of an enterprise through a pattern of racketeering activity. The jury found that he and Brown were RICO co-conspirators and that Brown, as part of that conspiracy, extorted money pursuant to the LGRC/NORC scheme. Accordingly, the money extorted constitutes the proceeds of the enterprise. Therefore, Stephen Edwards is appropriately held responsible for that loss. Though not involving an "acquittal,"[25] the opinion in *United States v. Corrado*, 227 F.3d 543 (6th Cir. 2000) (*Corrado I*) is instructive. In *Corrado I*, two mobsters convicted of RICO asserted that they should not be liable for any forfeiture award because they did not participate in any of the illegal conduct, received none of the proceeds and the gangsters who committed the acts and received the proceeds were acting to further their own agenda. The Sixth Circuit rejected these arguments, reasoning that "it is not determinative that the defendant committed the crime to further his own agenda, if indeed he was only able to commit the crime by virtue of his position within the enterprise." *Id.* at 553-55. The only requirement is that the criminal conduct be foreseeable. *Id.* at 558. Similarly, Brown's ability to

---

[25]As the LGRC/NORC predicates were not charged as substantives offenses, technically Stephen Edwards was not acquitted.

extort money from LRGC/NORC clearly came from his position in the RICO enterprise. Without his connection to the enterprise, his threats would have lacked substance.

**B.**

U.S.S.G. § 2C1.1 provides a base offense level of 10 for extortion. This level is to be increased by the corresponding number of levels provided by U.S.S.G. § 2F1.1, which provides for a thirteen-level increase for loss amounts between $2,500,001 and $5,000,000.

Although the determination of loss for the purposes of U.S.S.G. § 2F1.1 is a factual finding reviewed for clear error, the district court's choice of the method by which losses are determined involves an application of the sentencing guidelines, which is reviewed *de novo*. *United States v. Saacks*, 131 F.3d 540, 542-43 (5th Cir. 1997).

Stephen Edwards does not contend on appeal that the $1.9 million figure found by the district court with respect to the other schemes is inaccurate. In addition, the jury found, and the evidence supports, a finding that Shetler funneled at least $550,000 in extortion proceeds from the Players Scheme to Edwin and Stephen Edwards. There was substantial evidence in the record that Shetler kept at least one-third of all the proceeds of the Players Scheme. Extrapolating from this evidence, this would amount to, at minimum, an additional $225,000 that Shetler obtained through the extortion scheme, which constitutes part of the actual loss caused by the scheme. As the sum of $225,000, $550,000 and $1.9 million exceeds $2,500,001, any error by the district court in including additional monies, assuming one occurred, was harmless. Finally, as to Judge Parker's finding that Shetler was responsible for only $300,000 to $500,000 in loss, Stephen Edwards fails to cite any authority for why this finding, which relied on a completely different record, is legally significant.

**X.**

At sentencing, the district court found that Johnson intended to extort a 12.5% interest in the Belle of Baton Rouge, Jazz's riverboat project. It then calculated Johnson's "intended loss" for the purposes of the sentencing guidelines by summing 12.5% of $11,105,000, the Belle's net profits,[26] with 12.5% of $55.9 million, the amount paid by an outside party for Jazz Enterprises' interest in the Belle and the dockside development Catfish Town. In addition, the district court adjusted Johnson's offense level for obstruction of justice pursuant to U.S.S.G. § 3C1.1.

Johnson contends that the record does not support the district court's finding that he intended to extort a 12.5% interest in the entire Jazz riverboat project, including Catfish Town. Instead he contends that the record supports a finding that he intended to extort a 12.5% interest only in the casino. In addition, Johnson contends that the district court erroneously failed to require the government to provide evidentiary support for the pre-sentence reports' $11,105,000 and $55.9 million figures.[27] Finally, Johnson contends that the record does not support an adjustment for obstruction. He bases this contention on the fact that the government knew his statements were false at the time they were made. Therefore, he concludes, his false statement did not actually obstruct justice.

---

[26]In his brief, Johnson erroneously asserts that the pre-sentence report recommended a finding that there was $5.7 million in profits.

[27]Johnson may also contend that the loss figure is incorrect because Jazz could not have delivered a 12.5% interest in the Belle because it only owned 10%. To the extent that Johnson is making this argument, the government is correct that nothing in § 2F1.1 n.7 requires that the defendant be capable of inflicting the loss he intends. *See United States v. Ismoila*, 100 F.3d 380, 396 (5th Cir. 1996) (citing *United States v. Robinson*, 94 F.3d 1325, 1328 (9th Cir. 1996) for the proposition that "§ 2F1.1 does not require the loss the defendant intended to inflict be realistically possible"); *but see United States v. Watkins*, 994 F.2d 1192, 1196 (6th Cir. 1993) (holding, contra, that defendant must have been able to cause the loss); *United States v. Galbraith*, 20 F.3d 1054 (10th Cir.1994) (same). *Cf. United States v. Geevers*, 226 F.3d 186, 195 (3d Cir. 2000) (characterizing *Galbraith* and *Watkins* as the minority rule and declining to follow them).

## A.

Again, the district court's loss finding is reviewed for clear error. *United States v. Loe*, 262 F.3d 427, 437 (5th Cir. 2001). "In order to satisfy this clear error test all that is necessary is that the finding be plausible in light of the record as a whole." *United States v. Humphrey*, 104 F.3d 65, 71 (5th Cir. 1997). "A 'loss' under [U.S.S.G. 2F1.1] means the actual or intended loss to the victim, whichever is greater. Further, the amount of loss need not be determined with precision. The district court need only make a reasonable estimate given the available information." *United States v. Izydore*, 167 F.3d 213, 222 (5th Cir. 1999).

Finally, "[t]he presentence report is considered reliable evidence for sentencing purposes." *United States v. Clark*, 139 F.3d 485, 490 (5th Cir. 1998). "If no relevant affidavits or other evidence is submitted to rebut the information contained in the PSR, the court is free to adopt its findings without further inquiry or explanation." *United States v. Jefferson*, 258 F.3d 405, 413 (5th Cir. 2001).

The district court's finding that Johnson intended to extort 12.5% of the entire Jazz project is not clearly erroneous. Bradley, the Jazz principal extorted by Johnson, testified to this fact. Furthermore, the court was entitled to adopt the pre-sentence report's $11,105,000 and $55.9 million figures without further inquiry as Johnson failed to offer rebuttal evidence.[28]

## B.

"A finding of obstruction of justice under § 3C1.1 is a factual finding reviewed for clear error.

---

[28]In addition, we note that, contrary to his position on appeal, Johnson did not explicitly or implicitly object to the figures themselves, he objected only to using them in calculating the loss, e.g., as discussed, he contended that 12.5% of $55.9 million was not the intended loss because he did not intend to extort an interest in the entire project, not that $55.9 million was not the sale price of the entire project. Accordingly, Johnson had the burden of demonstrating plain error. See United States v. Fierro, 38 F.3d 761, 774 (5th Cir. 1994).

However, we review the district court's interpretation or application of the sentencing guidelines de novo." *United States v. Upton*, 91 F.3d 677, 687 (5th Cir. 1996).

The government correctly asserts that the obstruction enhancement was supported by Johnson's conviction on the false statements counts. U.S.S.G. § 3C1.1 & Application n. 4 ("This adjustment also applies to any other obstructive conduct in respect to the official investigation, prosecution, or sentencing of the instant offense where there is a separate count of conviction for such conduct."); *United States v. Crisci*, 273 F.3d 235, 240 (2d Cir. 2001) ("In this case, Crisci's separate count of conviction for making false statements to the FBI agent investigating the instant offense compelled the district court to apply Section 3C1.1.") (citing Application note 4); *United States v. Herr*, 202 F.3d 1014, 1017 (8th Cir. 2000). As discussed in Section F, *supra*, the false statements convictions are supported by the evidence.[29] Accordingly, the adjustment was proper.

*United States v. Surasky*, 976 F.2d 242, 245 (5th Cir. 1992), cited by Johnson, is distinguishable because there was no false statement conviction. In *Surasky*, this Court held "that a false statement made by a defendant to law enforcement officers cannot constitute obstruction of justice unless the statement obstructs or impedes the investigation at issue significantly." *Id.* In so holding, the panel relied on the language of then-Application Note 4(b),[30] which provided that "making false statements, not under oath, to law enforcement officers, unless Application Note 3(g)

---

[29]We note that § 3C1.1 is clearly applicable to cases where the defendant does not actually obstruct justice. U.S.S.G. § 3C1.1 ("If (A) the defendant willfully obstructed or impeded, *or attempted to obstruct or impede*, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (I) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.") (emphasis added).

[30]The application notes were subsequently amended. This language now appears in Application Note 5(b).

above applies" is not conduct warranting application of the enhancement, and the language of then-Application Note 3(g),[31] which instructs that "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigations or prosecution of the instant offense" does warrant application of the enhancement. However, Application Note 5 instructs that it applies only absent conviction. *See* U.S.S.G. § 3C1.1 Application Note 5 ("Some types of conduct ordinarily do not warrant application of this adjustment.... However, if the defendant is convicted of a separate count for such conduct, this adjustment will apply and increase the offense level for the underlying offense...").

## XI.

Martin contends that we must vacate the forfeiture order as to him if we vacate his money laundering and RICO convictions. He also contends that it should be vacated because he speculates based on his jury argument and the amount of the forfeiture award that the jury did not intend to award a forfeiture verdict as to him.

Because we affirm Martin's RICO and money laundering convictions, the former challenge fails. As to the latter, the jury explicitly found Martin liable on the forfeiture verdict. Martin's speculative attack, which is unsupported by authority or a record citation and contrary to the verdict, is frivolous.

## XII.

Finally, the defendants contend that various errors infected the entire prosecution, violating due process. The government interprets this argument as urging reversal based on judicial bias, but

---

[31]This language now appears in Application Note 4(g).

the defendants' assert in reply that they do not seek reversal based solely on judicial bias.[32]

We construe the defendants' argument as asserting that reversal is appropriate for "cumulative error." *United States v. Williams*, 264 F.3d 561, 572 (5th Cir. 2001) ("We have previously recognized the so-called cumulative error doctrine under which an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial.") (citation omitted). *See also United States v. Sepulveda*, 15 F.3d 1161, 1195-96 (1st Cir. 1993) (explaining the cumulative error doctrine).

Many of the "errors" cited by the defendants are unbriefed. These issues have been waived. *See United States v. Thames*, 214 F.3d 608, 611 n.3 (5th Cir. 2000); *see also* Fed. R. App. P. 28(a)(9)(A) (appellant's brief must contain his "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies."). Because, based upon our discussion above, the defendants' arguments on appeal establish only two unrelated and relatively insignificant errors, there are no errors to cumulate. *See United States v. McIntosh*, 280 F.3d 479, 484 (5th Cir. 2002).

## CONCLUSION

For the foregoing reasons, the defendants' convictions and sentences are hereby AFFIRMED.

---

[32]The defendants' reluctance to rely on judicial bias is not surprising in light of their citation to *United States v. Jordan*, 49 F.3d 152, 158 (5th Cir. 1995). In *Jordan* this Court made clear that the failure of a judge to recuse herself pursuant to 28 U.S.C. § 455(a) does not provide a basis for reversal absent evidence of actual bias or a nexus between actual errors and the appearance of bias. *See id.* at 158.